FILED

03/31/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0067

DA 19-0067

# IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 72

TAD BRENDEN,

      Plaintiff and Appellant,

   v.

CITY OF BILLINGS,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DV 17-1664
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Tucker P. Gannett, Amanda Beckers Sowden, Gannettt Sowden Law,
PLLC, Billings, Montana

      For Appellee:

          Gerry P. Fagan, Adam Warren, Moulton Bellingham PC, Billings, Montana

Submitted on Briefs:  July 31, 2019

Decided:  March 31, 2020

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1    Appellant Tad Brenden (Brenden) appeals the judgment of the Montana Thirteenth Judicial District Court, Yellowstone County, granting summary judgment to the City of Billing (City) on his claims that the City is vicariously liable for the tortious acts of former City employee Michael Glancy (Glancy).  The dispositive issue is:

> *Whether the District Court erroneously concluded as a matter of law that Glancy was not acting within the scope of his employment?*

¶2    We reverse and remand for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3    The City twice employed Brenden as an air rescue firefighter/airfield maintenance worker at the Billings Airport—once from January 2004 to March 2006 and again from November 2012 until November 2016.  Glancy was Brenden's immediate supervisor during both periods of employment.  In December 2014, a disagreement arose between Brenden and Glancy about shift scheduling that resulted in Brenden filing a grievance against Glancy with the City human resources director.  In subsequent depositions, Glancy and Brenden both described the shift scheduling disagreement as the breaking point in their professional relationship.  After Brenden filed the grievance, Glancy continually documented perceived workplace problems with Brenden for nearly two years in an electronic log titled the "Brenden Log."  Glancy maintained the log during work hours on his city-owned office computer at the airport.   Glancy also maintained copies on his office computer of corrective action forms he issued to Brenden, a negative annual performance review he issued to Brenden, and Brenden's rebuttal thereto.

2

¶4    In October 2016, while still employed by the City, Brenden applied for a switchman trainee position with Montana Rail Link (MRL). Brendan's job application listed Glancy as his City supervisor. MRL accordingly called Glancy at his airport office for a reference check on Brenden. Glancy confirmed Brenden's city employment, gave him an unqualified "positive reference,"[1] and, in response to a specific question from MRL, stated that Brenden was a "safe" employee. After MRL hired Brenden, he resigned his city employment, effective November 6, 2016. His last day was Friday, November 4, 2016.

¶5    MRL maintains a "hotline" (EthicsPoint) on its internet website as a means for employees and the public to submit anonymous complaints regarding MRL operations and employees. On Saturday, November 5, 2016, Glancy submitted an anonymous complaint on the EthicsPoint hotline falsely alleging that Brenden had stolen City property. The evidence conflicts as to whether Glancy submitted his complaint using his city-owned computer from his airport office or from home on his personal computer. In a subsequent deposition, the City's human resources director testified that, upon investigation by city information technology staff, the City determined that Glancy accessed the MRL website from his city-owned office computer at the airport for ten minutes and three seconds on November 5, 2016. The City could not definitively determine, however, whether he specifically accessed the MRL hotline feature of the website during that time. Glancy subsequently admitted that he accessed the MRL website from his airport office computer on November 5, 2016, but claimed that he did so only for the limited purpose of

---

[1] See District Court order granting summary judgment to the City.

3

determining whether MRL had a website complaint hotline. He claimed that, after confirming that it did, he later submitted his anonymous hotline complaint from his personal computer at home. On that day, Glancy was on a paid, on-call duty status with the City. On the hotline complaint form, Glancy characterized the nature of the complaint as "[s]tealing items issued during [the] course of employment" and further elaborated that:

> Tad was previously employed with the City of Billings. Upon his receipt of his two week notice he was instructed to return all airport/city issued items on his last day. Tad did not return uniform badges (2) valued at $200.

¶6 On November 9, 2016, MRL human resources officer Susan Twiford (Twiford) telephoned Glancy and inquired about the anonymous allegation. MRL called Glancy based on its prior knowledge that he was Brenden's city supervisor, had previously responded to MRL's initial reference check inquiry, and was thus the person who could best confirm or refute the truth of the allegation. During the call, Glancy told Twiford, *inter alia*, that Brenden had indeed stolen city property, was also involved in a violent incident in the workplace, had created a hostile working environment at the airport, and that he was "an HR nightmare." Glancy further stated that he had "tons of documentation that you're welcome to" and that "I'll send . . . to you." Glancy subsequently sent two emails to MRL with copies of various employment records attached, including corrective action directives issued to Brenden, a negative annual performance evaluation, and Glancy's "Brenden Log." Glancy sent the email and attachments during the work day from his airport office using his city email account. The transmittal emails included a signature line identifying Glancy as the City "Airport Operations Supervisor."

4

¶7     On November 10, 2016, based on the information received from Glancy on November 9, MRL terminated Brenden's employment on his second day on the job. Approximately two weeks later, Glancy sent Twiford an email stating that he had heard that their "mutual acquaintance ha[d] moved on" and that he hoped that the previously "shared items [would] find the shredder or vault." In April 2017, Glancy sent another email to Twiford asking her to notify him if MRL received "any inquiries" regarding Brenden. After learning of Glancy's post-employment communications with MRL regarding Brenden, the City terminated Glancy on June 22, 2017, on the ground that those communications violated City policy.

¶8     On November 8, 2017, Brenden sued the City in district court, asserting claims for tortious interference with business relations and negligent misrepresentation. On May 30, 2018, Brenden asserted two additional claims—defamation and breach of the Montana constitutional right to privacy. Brenden asserted that the City was vicariously liable for Glancy's tortious conduct under the common law doctrine of respondeat superior. On November 5, 2018, the City filed a motion for summary judgment on Brenden's claims on the asserted ground that Glancy engaged in the alleged tortious conduct outside the scope of his employment. The City asserted that it did not authorize Glancy's tortious conduct, did not benefit from it, and that it was the conduct of a rogue employee acting entirely for his own benefit. Brenden opposed the motion on the asserted ground that genuine issues of material fact precluded summary judgment as to whether Glancy committed the alleged tortious acts within the scope of his city employment.

5

¶9    On December 21, 2018, the District Court granted the City summary judgment on the stated ground that Glancy engaged in the alleged tortious conduct outside the scope of his employment. Citing Restatement (Second) of Agency § 228 (Am. Law Inst. 1958), the court essentially concluded that it was beyond genuine material dispute on the Rule 56 record that the City did not authorize Glancy to disclose Brenden's personnel information and records to MRL, and that the disclosures "did not 'grow out of'" his earlier response, within the scope of his employment, to MRL's initial refence check. The court reasoned that Glancy did not have any employment-related need or obligation to provide MRL further information regarding Brenden, much less false information. Citing Restatement (Second) of Agency § 228(1)(c) (tortious conduct in scope of employment must be "actuated, at least in part, by a purpose to serve the [employer]"), the court noted that Glancy's tortious conduct was of no benefit to the City after Brenden resigned and that its subsequent termination of Glancy for "violat[ing] . . . workplace guidelines show[s] that he went beyond the scope of employment and was in no part actuated by a purpose to serve the [City]." Brenden timely appeals.

**STANDARDS OF REVIEW**

¶10    Summary judgment is proper only when there is no genuine issue of material fact, and a party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c)(3). Whether a genuine issue of material fact exists or whether a party is entitled to judgment as a matter of law are conclusions of law reviewed de novo for correctness. *Winslow v. Mont. Rail Link, Inc.*, 2000 MT 292, ¶ 38, 302 Mont. 289, 16 P.3d 992. We must view the Rule 56

6

factual record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Weber v. Interbel Tel. Coop.*, 2003 MT 320, ¶ 5, 318 Mont. 295, 80 P.3d 88; *Gamble Robinson Co. v. Carousel Props.*, 212 Mont. 305, 311-12, 688 P.2d 283, 286-87 (1984).

**DISCUSSION**

¶11 *Whether the District Court erroneously concluded as a matter of law that Glancy was not acting within the scope of his employment?*

¶12 Brenden asserts that genuine issues of material fact precluded summary judgment as to whether Glancy engaged in the alleged tortious conduct within the scope of his employment. He asserts that the Rule 56 record could conceivably support findings that Glancy's unauthorized conduct "grew out of" the authorized scope of his employment and that he was at least in part motivated by an interest to serve the City. The City contrarily asserts that Brenden's assertion of respondeat superior fails as a matter of law because there is no evidence that the City benefitted from Glancy's tortious conduct or that Glancy acted in furtherance of the City's interest.

¶13 Distinct from direct liability for an employer's own tortious conduct, the common law doctrine of respondeat superior imposes vicarious liability on employers for the tortious conduct of employees committed while acting within the scope of their employment. *Kornec v. Mike Horse Mining & Milling Co.*, 120 Mont. 1, 7, 180 P.2d 252, 256 (1947); *Keller v. Safeway Stores*, 111 Mont. 28, 35, 108 P.2d 605, 610 (1940);

7

Restatement (Third) of Agency §§ 2.04, 7.03(2)(a), and 7.07 (Am. Law Inst. 2006).[2]  "The

doctrine establishes a principle of employer liability for the costs that work-related torts

impose on third parties."  Restatement (Third) of Agency § 2.04 cmt. b.  It recognizes, *inter*

*alia*, that the "ability to exercise control over . . . employees' work-related conduct

enables[,] [and provides incentive for,] the employer to take measures to reduce the

incidence of tortious conduct."  Restatement (Third) of Agency § 7.07 cmt. b.  *See also*

*Billig v. S. Pac. Co.*, 209 P. 241, 243 (Cal. 1922) (noting that respondeat superior depends

on employer's power and duty of control over the employee).  However, the elemental

limitations of the doctrine protect employers from becoming "insurer[s] against all harm

suffered by third parties with whom [their] employees may interact."  Restatement (Third)

of Agency § 7.07 cmt. b.

¶14    For purposes of respondeat superior, a tortious act occurred within the scope of

employment if the act was either expressly or implicitly authorized by the employer or was

incidental to an expressly or implicitly authorized act.  *See Kornec*, 120 Mont. at 8-12, 180

---

[2] Section 28-10-602, MCA, embodies the common law doctrine of respondeat superior.  *See Keller*, 111 Mont. at 35-36, 108 P.2d at 610 (citing §§ 7965-66 RCM (1935)); Restatement (Third) of Agency § 2.04 Reporter's Notes cmt. a.  Section 28-10-602 is an 1895 Montana adoption of California's adaptation of §§ 1253-54 of David Dudley Field's proposed but never enacted New York Civil Code (1865).  The Montana doctrine is generally in accord with the formulation set forth in Restatement (Third) of Agency §§ 2.04, 7.03(2)(a), and 7.07, and the predecessor sections of the Restatement (Second) of Agency.  *See Saucier ex rel. Mallory v. McDonald's Rests. of Mont., Inc.*, 2008 MT 63, ¶ 64, 342 Mont. 29, 179 P.3d 481; *Maguire v. State*, 254 Mont. 178, 182-83, 835 P.2d 755, 758 (1992); *Kornec*, 120 Mont. at 8-10, 180 P.2d at 256-57; *Keller*, 111 Mont. at 36-38, 108 P.2d at 610-11; Restatement (Third) of Agency § 7.07 Reporter's Notes cmt. a. (characterizing Restatement (Third) formulation as essentially a "consolidated treatment of" the Restatement (Second) formulation).  In Montana, governmental entities are subject to vicarious liability in respondeat superior like private parties.  *Kenyon v. Stillwater County*, 254 Mont. 142, 146, 835 P.2d 742, 745 (1992) (citing § 2–9–102, MCA).

P.2d at 256-58; *Keller*, 111 Mont. at 36-40, 108 P.2d at 610-12; Restatement (Third) of Agency § 7.07(2) cmt. b. *See also* Restatement (Second) of Agency § 228(1)(a), (c). Expressly authorized acts include, *inter alia*, acts the employer specifically directed or authorized the employee to perform. *See* § 28-10-402, MCA ("[a]ctual authority is authority that the principal intentionally confers upon the agent or intentionally or [negligently] allows the agent to believe that the agent possesses").

¶15     Implicitly authorized acts include acts reasonably necessary or customary under the circumstances to the performance of specifically authorized acts or functions and other acts "of the same general nature." Restatement (Second) of Agency § 229(1) cmt. a. *See also Kastrup v. Yellow Cab & Baggage Co.*, 282 P. 742, 747 (Kan. 1929) (cited in *Kornec*— "[e]xpress authority to do an act carries with it authority to do those subordinate and incidental acts which may be reasonably necessary and proper to be done, or which are usually and ordinarily done, in order effectively to do the main thing"). *Accord* § 28-10-405(1), MCA. However, even though a "means of accomplishing an authorized result," an act, or the manner in which the employee performed it, may yet be "so outrageous or whimsical" to be beyond the scope of what the employer implicitly contemplated under the circumstances. Restatement (Second) of Agency § 229 cmt. b. Relevant factors in determining whether an act or conduct was implicitly authorized by the employer include, *inter alia*: (1) whether the act was of a type such employees commonly perform; (2) "the time, place and purpose of the act"; (3) whether the employer had reason to expect that the employee might so act under the circumstances; (4) the extent, if any, to

9

which the act departed from a normal or typical means of accomplishing an authorized task or function; and (5) whether the employer furnished the instrumentality the employee used to harm the third party at issue. *Keller*, 111 Mont. at 36-37, 108 P.2d at 610; Restatement (Second) of Agency § 229(2).[3] The finder of fact may infer that an employee performed an expressly or implicitly authorized act in furtherance of the interest of the employer. *See* Restatement (Second) of Agency § 235 cmt. a.

¶16    Even an act or conduct not expressly or implicitly authorized by the employer is nonetheless within the scope of employment if the act was incidental to the performance of an expressly or implicitly authorized act and at least partially motivated by the employee's intent or purpose to serve the employer's interest. *Keller*, 111 Mont. at 36-40, 108 P.2d at 610-12. *Accord Kornec*, 120 Mont. at 9-10, 180 P.2d at 256-57; Restatement (Third) of Agency § 7.07(2) cmt. b; Restatement (Second) of Agency §§ 228(1)(a), (c), and 229(1). "An act may be incidental to an authorized act," even though "an entirely different kind of an act." Restatement (Second) of Agency § 229 cmt. b. However, the incidental act:

> must be . . . subordinate to or pertinent to an act which the [employee] [was] employed to perform. . . . The fact that a particular employer ha[d] no reason to expect the particular [employee] to perform the act is not conclusive. . . . [For example,] [a]n assault by one employed to recapture a chattel, while entirely different from the act which he was employed to do, which was

---

[3] *See also* Restatement (Third) of Agency § 7.07 cmt. b (Restatement (Third) of Agency phrases its scope-of-employment standard in more general terms than Restatement (Second) to reflect the modern "working circumstances of many managerial and professional employees and others whose work is not so readily cabined by temporal or spatial limitations"—"[m]any employees in contemporary workforces interact [with third parties] on an employer's behalf" despite that "the employee is neither situated on the employer's premises nor continuously or exclusively engaged in performing assigned work").

> merely to take possession of the chattel, may be within the scope of employment, unless committed with such violence that it bears no relation to the simple aggression which was reasonably foreseeable.

Restatement (Second) of Agency § 229 cmt. b. Thus, the fact that the employer did not authorize the tortious conduct, the employee was disobedient, or the employee disregarded the employer's instruction or rule does not necessarily preclude a finding that the employee was acting in furtherance of the employer's interest. *Kornec*, 120 Mont. at 9-10, 180 P.2d at 256-57; *Keller*, 111 Mont. at 38-40, 108 P.2d at 611-12; Restatement (Third) of Agency § 7.07(2) cmt. c; Restatement (Second) of Agency § 230. Though itself unauthorized or disobedient, an act was incidental to expressly or implicitly authorized conduct if it "arose out of" and was closely related to the performance of an expressly or implicitly authorized act or function. *Kornec*, 120 Mont. at 9-10, 180 P.2d at 256-57. Thus, depending upon the circumstances, an employer may be vicariously liable in respondeat superior for negligent, willful, and malicious acts of employees committed within the scope of their employment. *Kornec*, 120 Mont. at 7-8, 180 P.2d at 256; *Keller*, 111 Mont. at 38, 108 P.2d at 611.[4]

¶17 The fact that an employee's predominant motive was self-interest does not preclude an act from the scope of employment if the employee was motivated by any purpose or intent to serve the employer's interest "to any appreciable extent." Restatement (Second) of Agency § 236 cmt. b. Thus, a dual or mixed motive does not preclude a finding that the

---

[4] *But see Maguire*, 254 Mont. at 182-85, 835 P.2d at 758-59 (finding a criminal act (rape) outside the scope of employment for purposes of respondeat superior and declining to extend non-delegable duty doctrine to make institutional caretaker entity vicariously liable for crime committed against an incapacitated ward by the caretaker's employee).

11

employee was acting in furtherance of the employer's interest unless the employee was engaged in "an independent course of conduct not intended . . . to serve *any* purpose of the employer." Restatement (Third) of Agency § 7.07(2) cmt. b (emphasis added). *Accord Keller*, 111 Mont. at 37, 108 P.2d at 611 (personal motive does not take the act beyond the scope of employment "unless it clearly appear[s] that the [employee] could not have been directly or indirectly" acting in furtherance of the employer's interest in any regard); *Webster v. Mountain States Tel. & Tel. Co.*, 108 Mont. 188, 198-99, 89 P.2d 602, 604-05 (1939); Restatement (Second) of Agency § 230 cmt. c ("[c]onduct is not within the scope of employment if it has no connection with the act which the employee is required to perform"); Restatement (Second) of Agency § 235 (an act is not within the scope of employment if performed "with no intention to perform it as a part of or incident to a service on account of which he [or she] is employed").

¶18 The question of whether an employee was acting at least partially in furtherance of the employer's interest does not depend on whether the employer actually profited or benefitted from the act. *Taber v. Maine*, 67 F.3d 1029, 1036 (2nd Cir. 1995) (noting "hasty [modern] retreat" from that aspect of the "older conception of respondeat superior" articulated in Restatement (Second) of Agency § 228); *Perez v. Van Groningen & Sons, Inc.*, 719 P.2d 676, 680 (Cal. 1986). The state of mind of the employee is determinative— the issue is whether the employee was at least partially motivated to serve the employer's interest "to some extent." Restatement (Second) of Agency § 235 cmt. a. *Accord* Restatement (Third) of Agency § 7.07 cmt. b ("employee's intention severs the

12

basis for treating" an "act as that of the employer"). The question of whether an employee was at least partially motivated by an intent or purpose to directly or indirectly further the employer's interest is a question of fact for consideration under the totality of the circumstances. *Denke v. Shoemaker*, 2008 MT 418, ¶¶ 73-74, 347 Mont. 322, 198 P.3d 284; *Kornec*, 120 Mont. at 10, 180 P.2d at 257; *Keller*, 111 Mont. at 36, 38, 108 P.2d at 610-11; Restatement (Second) of Agency § 235 cmt. a.

¶19    In *Keller*, we considered, *inter alia*, whether the trial evidence was sufficient to support a jury finding that the store manager of a grocery store corporation (Safeway) was acting within the scope of his employment when he personally traveled from the Butte Safeway store to the home of the plaintiff's mother and made a slanderous allegation that the plaintiff deceitfully paid for groceries with a forged or otherwise bad check. *Keller*, 111 Mont. at 39-41, 108 P.2d at 611-12. Based on evidence that Safeway discouraged its managers from accepting personal checks from customers (by holding managers personally liable for customer checks that did not clear) and that a Safeway supervisor had specifically told that particular manager not to accept personal checks from customers (like the plaintiff) he did not know, the employer asserted in defense of the ensuing slander claim that the store manager acted on his own, outside the scope of his employment. *Keller*, 111 Mont. at 39-40, 108 P.2d at 612. Even assuming, arguendo, that Safeway had not expressly or implicitly authorized the manager to accept a personal check from the plaintiff, we noted that a fact question still remained as to whether the manager made the slanderous statement incidental to the performance of an authorized act and at least partially in furtherance of

13

the employer's interest. *Keller*, 111 Mont. at 40, 108 P.2d at 612. Acknowledging that Safeway had not expressly or implicitly authorized its managers to make slanderous statements about customers, we held that the jury could nonetheless have reasonably found that the manager's personal trip to the mother's home, and ensuing slanderous statement, were "so closely intermingled with" his authorized employment duties that the "slander was a wrong committed, if not in furtherance of his employment, at least as an incident thereto." *Keller*, 111 Mont. at 40, 108 P.2d at 612. We thus held that the evidence was sufficient to support the jury's finding that the manager made the slanderous statement to the plaintiff's mother within the scope of his employment. *Keller*, 111 Mont. at 40, 108 P.2d at 612.[5]

¶20    Similarly, in *Kornec*, after a jury found a mining company vicariously liable for an employee's intentional assault and battery of the plaintiff, we considered whether the trial evidence was sufficient to support the jury finding that the employee was acting within the scope of his employment, as a miner and general laborer, when he physically assaulted the third-party plaintiff. *Kornec*, 120 Mont. at 10, 180 P.2d at 257. Though accounts of the events varied, the employee was in the process of effecting repairs to a diversionary dam on company property adjacent to the plaintiff's property when the plaintiff appeared and challenged him about water backing up from the dam onto the plaintiff's property. *Kornec*, 120 Mont. at 6-7, 180 P.2d at 255-56. According to the plaintiff's version of events, the

_____

[5] We ultimately reversed the jury verdict for retrial based on an excessive damages award not supported by the evidence. *Keller*, 111 Mont. at 41-44, 108 P.2d at 612-14.

14

mining company employee, in response to the plaintiff's "remonstrat[ion] . . . and complain[t]" about the dam, walked onto the plaintiff's property and then threatened and repeatedly beat him with a shovel. *Kornec*, 120 Mont. at 7, 180 P.2d at 255. The employee contrarily asserted that the plaintiff attacked him and that he acted only in self-defense. *Kornec*, 120 Mont. at 7, 180 P.2d at 255. In its defense, the company asserted that the employee was acting outside the scope of his employment because his assault of the plaintiff "was a personal and independent act . . . not binding" on the employer. *Kornec*, 120 Mont. at 4, 180 P.2d at 254.

¶21 Despite conflicting evidence, we held that there was sufficient evidence upon which the jury could have reasonably concluded that the employee was "carrying out the duties for which he was employed at the time and place assigned" when the verbal and resulting physical altercation occurred between the employee and the plaintiff. *Kornec*, 120 Mont. at 10-11, 180 P.2d at 257. Noting further that there was no evidence that the employee "held any personal grudge or ill will against the plaintiff," we affirmed the jury verdict, holding:

> The question as to whether [the employee] was acting within the scope of his employment was a question for the jury under proper instruction. Under the facts disclosed there was evidence presented from which a jury could find that the act complained of was within the scope of the actor's employment and done while engaged in his masters' business and "in furtherance of that business and the masters' interest."

*Kornec*, 120 Mont. at 11, 180 P.2d at 257.

¶22 Similarly here, Glancy was employed by the City as an airport supervisor. His authorized duties included, *inter alia*, supervising Brenden and other airport rescue and

15

maintenance personnel. *Inter alia*, the City authorized him to assign work to Brenden and to direct and supervise his performance of that work. As Brenden's immediate supervisor, Glancy was authorized to, and did in fact, document perceived performance deficiencies or misconduct, take and document any corrective or disciplinary action deemed necessary, and conduct regular periodic evaluations of Brenden's performance and conduct. The City correctly points out that there is substantial evidence that Brenden was aware of an unwritten city rule prohibiting supervisors from giving prospective employers *any* information regarding current or former employees. However, there is also evidence upon which the finder of fact could reasonably infer that, in the absence of a written policy, Glancy's response to MRL's initial reference check regarding Brenden (verifying his city employment, dates of employment, and stating that he was a "safe" employee) was at least implicitly authorized by the City as of a type that an immediate supervisor might typically provide in response to reference checks from prospective third-party employers.[6]

¶23 The Rule 56 record is similarly ambiguous regarding Glancy's conduct on November 5 and 9, 2016. On one hand, Glancy submitted his anonymous November 5 "hotline" complaint to MRL on a Saturday, a day off from his regularly scheduled work.

---

[6] See Dep. Michael Glancy 21:21-22:12, 23:16-19, 25:1-4, and 101:6-102:15; Dep. Scott Trent 52:22-53:1 and 53:16-24; Dep. Karla Stanton 54:7-22 (noting lack of written City policy barring supervisors from responding to third-party reference checks). Based on the Rule 56 record, the City asserted on page 3 of the statement of facts section of its Brief in Support of Motion for Summary Judgment (Doc. 22) that it "does not allow supervisors . . . to provide any information" regarding current or former city employees to prospective employers "*other than* the verification of dates of employment and job titles." (Emphasis added.) On appeal, the City did not contest the District Court's conclusion that no genuine issues of material fact existed on the Rule 56 factual record that Glancy's initial act of giving "MRL a positive reference check" regarding Brenden "was within the scope of his employment."

16

He asserts that he submitted it at home from his personal computer. On the other hand, it is beyond genuine material dispute that, upon investigation, the City verified that Glancy used his city-owned office computer to access the MRL website for over ten minutes from his city office on the same day he submitted his MRL "hotline" complaint through that same website. It is further beyond genuine material dispute that, though not working on a regularly scheduled shift, Glancy was on a paid, on-call work status at the time.

¶24 As to Glancy's conduct on November 9, 2016, there is evidence upon which to reasonably conclude that, on November 9, 2016, MRL specifically contacted him, in his capacity as Brenden's prior supervisor, to follow-up on his earlier "positive reference" regarding Brenden and verify or refute the truth of the subsequent anonymous allegations against him. As before, MRL again contacted and spoke with Glancy at his city office telephone number during a workday while Glancy was in the office on the job. As his former supervisor, Glancy told MRL that Brenden had indeed stolen City property and that he was further involved in a violent incident in the workplace, created a hostile working environment, and was "an HR nightmare." During that conversation, Glancy told MRL that he had "tons of documentation that you're welcome to" and which "I'll send . . . to you." Glancy subsequently sent two emails to MRL with copies of various employment records attached, including a corrective action directive issued to Brenden, a negative annual performance evaluation, and the "Brenden Log," which Glancy created and kept while on the job as Brenden's supervisor. Glancy sent the email transmittals from his airport office using his city-owned computer and city email account during the work day

17

while on the job. Each email included a signature line identifying Glancy as the City "Airport Operations Supervisor." The verbal and documentary information Glancy provided to MRL on November 9, 2016, was work-related employee performance and conduct information gathered, noted, and documented by Glancy in the course of his performance and function as Brenden's immediate City supervisor.

¶25 As noted by the District Court, it is beyond genuine dispute that the City did not expressly or implicitly authorize Glancy to anonymously provide personnel information, much less false information, to a third-party employer regarding a former city employee. Nor did the City authorize him to again make false and derogatory allegations, or disclose related performance and conduct records, regarding Brenden on November 9, 2016, in response to MRL's follow-up inquiry. However, despite conflicting evidence, there is also evidence, as in *Keller* and *Kornec*, upon which the finder of fact could reasonably conclude that, as was the case with his earlier response to MRL's initial inquiry, the City at least implicitly authorized Glancy to field and respond to MRL's follow-up inquiry to some extent. At that time, the City had no written policy prohibiting supervisors from responding to employee reference checks from prospective employers. In subsequent testimony, Glancy indicated that he thought it was okay to provide additional information after Brenden had resigned. Despite conflicting evidence, there is sufficient evidence upon which to reasonably infer that Glancy's statements to MRL on November 9, 2016, were of a type of the same general nature that a former supervisor might typically make in response to a follow-up inquiry from a prospective employer to whom the supervisor had previously

18

given inconsistent or incomplete information. It is beyond genuine material dispute that the City furnished the instrumentalities (i.e., computer, office, phone, email account, internet access, and personnel records) by which Glancy caused the alleged harm to Brenden. Thus, despite conflicting evidence, there is sufficient evidence from which the finder of fact could reasonably infer that MRL contacted and spoke with Glancy on November 9, 2016, in his official capacity as Brenden's former supervisor, that Glancy spoke with MRL in that capacity, and that he subsequently emailed formal and informal City performance or personnel records regarding Brenden to MRL, either in his official capacity or at least in direct relation and follow-up to his earlier response, within the scope of his employment, to MRL's initial reference check.

¶26 The evidence regarding Glancy's motivation is similarly ambiguous. It is beyond genuine material dispute that Glancy had some degree of personal animus toward Brenden, and a resulting personal motive to wish or cause him harm, and that the City could not have benefitted from Glancy's disclosures to MRL after Brenden resigned. Thus, there is evidence upon which the factfinder could reasonably conclude that Glancy's conduct on November 5 and 9 was an independent, personally motivated, course of conduct not intended to serve any City purpose or interest. However, based on Glancy's subsequent disavowal of any animosity toward Brenden, and the circumstances under which he acted on November 9, there is evidence upon which the finder of fact could reasonably infer that Glancy had no, or only an incidental, motive to harm Brenden and that his statements, and related email transmittals, to MRL on that date were at least partially motivated by an intent

19

or purpose to correct the prior inaccurate "positive reference" he gave to MRL on behalf of the City. Whether the City actually benefitted from Glancy's conduct is not determinative of Glancy's subjective motivation on November 9, 2016.

¶27 Even if not authorized by the employer, and itself not motivated by any intent or purpose to serve the employer, an employee's tortious conduct may still be incidental to expressly or implicitly authorized conduct if "closely intermingled [there]with" and at least partially intended as a means to accomplish an expressly or implicitly authorized task or purpose. *Keller*, 111 Mont. at 40, 108 P.2d at 612. Here, as in *Keller* and *Kornec*, a genuine issue of material fact exists on the Rule 56 record as to whether Glancy's verbal statements, and related email transmittals, to MRL on November 9 were closely related and arose from implicitly authorized conduct, and were thus incidental thereto.

¶28 In the case of an unauthorized employee communication, an additional consideration may be a relevant, *inter alia*, in determining whether the employee's conduct was incidental to expressly or implicitly authorized conduct for purposes of respondeat superior. Unauthorized statements by an employee to a third-party may be incidental to expressly or implicitly authorized conduct if the employee had apparent authority to make such statements and harm resulted from the third-party's reasonable reliance thereon. *See* Restatement (Second) of Agency §§ 248, 265. *See also Keller*, 111 Mont. at 38-39, 108 P.2d at 611 (noting effect of apparent authority in the context of respondeat superior);

Restatement (Second) of Agency § 219(2)(d) cmt. e.[7] If an employee causes harm "to [the] business relations [of a third party] . . . by defamation or other methods of untruthful publicity [to another], [an employee] with apparent authority to make [such] statements binds his employer, irrespective of . . . motive." Restatement (Second) of Agency § 248 cmt. b.

¶29    Here, the District Court did not address Brenden's assertions that Glancy acted within the scope of his apparent authority as a city supervisor and that MRL reasonably relied on his derogatory statements, and related email transmittals, to Brenden's detriment. The City asserts that the court properly disregarded Brenden's apparent authority theory because he did not separately plead it as a distinct claim. While generally a theory of vicarious liability distinct from respondeat superior, *see* § 28-10-606, MCA, and Restatement (Third) of Agency §§ 2.03 cmt. a-b, 7.03(2)(b), and 7.08 (vicarious liability for the tortious conduct of an agent acting *outside* the scope of actual authority but within the scope of the agent's apparent or ostensible authority), apparent authority may also be relevant in considering whether an employee made tortious statements to another within

---

[7] Ostensible or apparent authority is the authority a principal intentionally or negligently causes or allows a third party to reasonably believe an agent has.    Section 28-10-403, MCA. *Accord* Restatement (Third) of Agency § 2.03.    "If the principal places a person in a position or office with specific functions or responsibilities, from which third parties will infer that the principal assents to acts by the person requisite to fulfilling the specific functions or responsibilities, the principal has manifested such assent to third parties." Restatement (Third) of Agency § 1.03 cmt. b.    "A third party who interacts with the person, believing the manifestation to be true, need not establish a communication made directly to the third party by the principal to establish the presence of apparent authority." Restatement (Third) of Agency § 1.03 cmt. b.    The scope of an agent's apparent authority depends on the totality of the circumstances "surrounding the transaction" at issue. *See Butler Mfg. Co. v. J & L Implement Co.*, 167 Mont. 519, 527, 540 P.2d 962, 967 (1975) (quoting 2A C.J.S. Agency § 159 p. 795 (1973)).

the scope of employment for purposes of respondeat superior. *See Keller*, 111 Mont. at 38-39, 108 P.2d at 611; Restatement (Second) of Agency §§ 247-48. Because respondeat superior "is not a free-standing or independent tort cause of action" but, rather, a common law agency theory of vicarious liability for the tortious conduct of another, *Saucier*, ¶ 64, Brenden did not have to separately plead his apparent authority theory of respondeat superior as a distinct liability claim. The City does not dispute that he properly pled a number of distinct tort claims under which he asserts the City is vicariously liable. Thus, Brenden's assertion of apparent authority, as a consideration relevant to whether Glancy's tortious conduct was incidental to implicitly authorized conduct for purposes of respondeat superior, was not precluded by his failure to separately plead it as a theory of liability distinct from his properly pled claims.

¶30   The City's assertion of unfair surprise is further undermined by the fact that, however inartfully, Brenden raised apparent authority as a respondeat superior consideration in opposition to the City's motion for summary judgment. The City has not demonstrated that Brenden's apparent authority theory is not factually supported by well-pled facts in his complaint, or on the Rule 56 record, viewed in the light most favorable to him. On the record in this case, apparent authority may thus be a relevant consideration, *inter alia*, in determining whether Glancy's November 9 verbal statements, and related email transmissions, to MRL were incidental to implicitly authorized conduct.

22

¶31 Genuine issues of material fact preclude summary judgment as to whether Glancy's verbal statements, and related email transmittals, to MRL on November, 9, 2016, were incidental to implicitly authorized conduct, and thus within the scope of his employment. We hold that the District Court erroneously granted summary judgment to the City on Brenden's claims. We reverse and remand for further proceedings in accordance with this Opinion.

/S/ DIRK M. SANDEFUR

We concur:

/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE
/S/ INGRID GUSTAFSON

Justice Beth Baker, dissenting.

¶32 Whether an employee acted within the scope of his or her duties to the employer generally is a question of fact. *Kornec*, 120 Mont. at 5, 180 P.2d at 254. It is a question of law for the court, however, "when only one legal inference may reasonably be drawn from the facts." *Bowyer v. Loftus*, 2008 MT 332, ¶ 8, 346 Mont. 182, 194 P.3d 92; *Denke v. Shoemaker*, 2008 MT 418, ¶ 74, 347 Mont. 322, 198 P.3d 284. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Kerr v. St. Vincent Healthcare*, 2016 U.S. Dist. LEXIS 38918

at \*2 (D. Mont. Feb. 29, 2016) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)). Applying our established precedent to the summary judgment record, I agree with the District Court that no rational juror could find that Mike Glancy was acting within the course and scope of his employment when he gave MRL false and confidential personnel information after Brenden had left his City employment. I would affirm the District Court's grant of summary judgment to the City.

¶33 As the Court observes, we have considered numerous cases seeking to hold an employer liable for an employee's actions as taken within the course and scope of employment; in some of those cases, depending on the circumstances involved, we have upheld an award of summary judgment to the employer. A few consistent rules emerge from our precedent. To impose liability upon an employer under the doctrine of respondeat superior,

> [t]he servant or agent must have been acting in the "course of his employment," in "furtherance of his employer's interest," or "for the benefit of his master," "in the scope of his employment," etc. But a servant who acts entirely for his own benefit is generally held to be outside the scope of his employment and the master is relieved of liability.

*Kornec*, 120 Mont. at 8, 180 P.2d at 256 (citing *Harrington v. H. D. Lee Mercantile Co.*, 97 Mont. 40, 59, 180 P.2d 553, 558 (1934)). To be within the scope of the employment, even if not expressly authorized, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized. *Keller v. Safeway Stores*, 111 Mont. at 36, 108 P.2d at 610.

24

In determining whether or not the conduct, although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered: (a) Whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (f) [sic] whether or not the master has reason to expect that such an act will be done; and (i) [sic] the extent of departure from the normal method of accomplishing an authorized result.

*Keller v. Safeway Stores*, 111 Mont. at 36-37, 108 P.2d at 610 (quoting Restatement of the Law of Agency § 229) (Am. Law. Inst. 1933).

¶34 *Keller* and *Kornec* make clear, as still recognized in the Restatement, that the employee's "failure of duty" or disobeying an instruction of the employer is not the key inquiry—as respondeat superior exists to hold an employer liable for the employee's *wrongful* acts. *Keller*, 111 Mont. at 35-36, 108 P.2d at 610; *Kornec*, 120 Mont. at 9, 180 P.2d at 256 (citing Restatement of Agency § 230) ("An act, although forbidden or done in a forbidden manner, may be within the scope of employment."). *See also Denke*, ¶ 79 (because the doctrine of respondeat superior is designed to hold an employer liable for its employee's wrongful conduct, it contemplates that conduct such as unlawful retaliation was committed within the scope of employment).

¶35 But an agent's or employee's act is not within the scope of employment if it is a "frolic of the agent's own" or an "act animated purely by personal motives." *Keller*, 111 Mont. at 38, 108 P.2d at 611. Thus, what is key is whether the employee was "endeavoring to promote the principal's business." *Keller*, 111 Mont. at 37-38, 108 P.2d at 611. *Accord Roberts v. Pegasus Gold Corp.*, 273 Mont. 266, 270, 903 P.2d 782, 784 (1995) ("In the law of respondeat superior, the harmful force is always

25

an act of the servant . . . . The inquiry is whether the performance of that act was in furtherance of the master's business.") (quoting 1 Larson, *Workmen's Compensation Law* § 14.00 4-1 to 4-2, and contrasting with the law of workers' compensation). The *Keller* jury thus could find the Safeway manager's alleged slanderous comment to be within the scope of employment because, "taken at its face value, [the comment could] reasonably be said to have been an intended means by which [the employee] expected to obtain payment on the no good check." *Keller*, 111 Mont. at 40, 108 P.2d at 612.

¶36    We noted in *Bowyer*, on the other hand, that "summary judgment for the employer is proper if the employee's activity is not related to the employer's business." ¶ 16. Despite the fact that the employee's job duties included transporting his crew to the job site and back to the motel in his personal vehicle, we agreed with the district court that the employee, after dropping off the crew at the motel, was on a "non-work-related jaunt" for dinner and bar-hopping when the collision occurred. *Bowyer*, ¶ 16. The employer's "culture of safety" policy did not support the plaintiffs' argument that the employee's acts in causing the collision were within the scope of his employment; the policy addressed off-duty activities of employees only insofar as those activities affected on-duty work performance. *Bowyer*, ¶ 15. Nothing in the summary judgment record indicated that the employee's travel the evening of the collision "was at [the employer's] request or even with its knowledge." *Bowyer*, ¶ 16.

¶37    We upheld summary judgment for the employer in *Roberts* because its employee's conduct of either throwing an explosive device out of his truck or intentionally causing the

truck to backfire was not authorized by the employer or incidental to the employee's authorized conduct (of driving a company vehicle from the job site), and did not benefit the employer in any way. *Roberts*, 273 Mont. at 270-71, 903 P.2d at 784.

¶38 In contrast, we agreed that the employer in *Rocky Mountain Enters. v. Pierce Flooring*, 286 Mont. 282, 306, 951 P.2d 1326, 1341 (1997), was not entitled to summary judgment. We relied in part on evidence that the employee who vandalized the vehicles of the plaintiff—business competitors of his employer—knew his actions could harm the competitors' business activities, raising a genuine issue of fact for the jury whether he acted in his employer's interests and thus within the scope of employment.

¶39 Applying Montana law, the United States District Court for the District of Montana awarded summary judgment to the employer in *Kerr*, 2016 U.S. Dist. LEXIS at \*11 (adopted by and summary judgment granted, 2016 U.S. Dist. LEXIS 37955 (D. Mont. Mar. 23, 2016)). The federal court concluded that the employer hospital was not liable under respondeat superior for the alleged defamatory comment a nurse made to plaintiff's sister that the plaintiff was "out of his mind" and needed to be committed to a mental hospital. The court relied on the lack of any evidence that the nurse's statement was made for the hospital's benefit "or in furtherance of its interest." Rejecting the notion that the statement was incidental to the nurse's authorized conduct, the court found that the plaintiff

> failed to demonstrate the statement is one which is commonly made by St. Vincent Healthcare employees, that it does not constitute a departure from the normal, authorized tasks of a nurse, or that St. Vincent Healthcare would have had reason to expect the nurse would make the statement.

27

2016 U.S. Dist. LEXIS at *8.

¶40 A key part of our opinion in *Kornec*, in which we affirmed the jury's finding of an employer's liability, was the longstanding controversy between the plaintiff and the tortfeasor's employer. 120 Mont. at 10, 180 P.2d at 257. Given that well-known controversy, officials of the defendant company "might reasonably have apprehended that [the employee] might become involved in an altercation with the plaintiff when they dispatched [the employee to the site where the assault then occurred.]" *Kornec*, 120 Mont. at 10, 180 P.2d at 257. "The test of the defendant company's liability is not whether the assault was committed in accordance with the master's instructions but whether the act complained of arose out of and was committed in prosecution of the task the servant was performing for his master." *Kornec*, 120 Mont. at 9-10, 180 P.2d at 257.

¶41 The summary judgment record in this case reveals no evidentiary basis on which a rational jury could find that Glancy's anonymous tip to the MRL EthicsPoint hotline or his unabridged disgorging of confidential personnel information to Susan Twiford when she predictably followed up with him by phone was in any respect in furtherance of the City's interest or committed in prosecution of any task or authority the City conferred on him. First, Glancy obviously knew the City policy when he answered Twiford's first phone call by giving brief, responsive answers to her factual questions and advising her to "talk to HR." His authorized conduct—advising Twiford in response to specific questions that Brenden was punctual, had a good attendance record, and was a safe worker—was enough "to allow Mr. Brenden to proceed with his application with MRL." Second, he waited until

28

Brenden had resigned his City employment and was out of Glancy's hands to report his hotline tip—a tip that then grew into disclosure of prohibited information and outright falsehood about Brenden's employment history. With the assumption that Brenden was no longer in the City's employ and there being no evidence that he would be working on City-affiliated business in his new position, there is no indication that Glancy's disclosures could serve the City's purposes whatsoever. What's more, his unauthorized hotline report, information disclosures, and statements to Twiford were not, by any rational inference, incidental to authorized conduct because they admittedly: were not disclosures commonly made by City employees; departed from the normal, authorized tasks of a City supervisory employee; and were beyond any statements that the City would have had reason to expect him to make if contacted for a reference check. Brenden submitted no evidence to suggest otherwise.

¶42    The application of our precedent to award judgment to the City as a matter of law is consistent with principles of the Restatement of Agency, which our case law reflects. The Court acknowledges that the Restatement generally aligns with our precedent. Opinion, ¶ 13 n.2. Stated generally, as the Restatement (Third) of Agency § 7.07 does, "An employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (Third) of Agency § 7.07(2). Under this principle,

> [A]n employee's tortious conduct is outside the scope of employment when the employee is engaged in an independent course of conduct not intended to further any purpose of the employer. An independent course of conduct represents a departure from, not an escalation of, conduct involved in

29

performing assigned work or other conduct that an employer permits or controls. When an employee commits a tort with the sole intention of furthering the employee's own purposes, and not any purpose of the employer, it is neither fair nor true-to-life to characterize the employee's action as that of a representative of the employer. The employee's intention severs the basis for treating the employee's act as that of the employer in the employee's interaction with the third party.

Restatement (Third) of Agency § 7.07(2) cmt. b. Applied to the undisputed record here, in which Glancy admitted under oath that he provided information to MRL not to "help[] out the City . . . as part of [his] job-related functions," but "to let them know what kind of employee they were hiring[,]" there is no genuine issue of material fact. Glancy's conduct was not intended to and did not further any purpose of his employer but was an independent course of conduct outside the scope of his City employment.

¶43 Finally, the City is correct that Brenden cannot rely on the doctrine of apparent authority to pursue his claims under these circumstances. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03. Quoting the earlier version of this principle from Restatement of the Law of Agency § 27, we held, "Apparent authority to *do an act* may be created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the *principal* consents to have *the* act done on his behalf by the person *purporting to act for him*." *Kraus v. Treasure Belt Mining Co*., 146 Mont. 432, 435, 408 P.2d 151, 152 (1965) (emphasis in original). There are two inquiries in analyzing

30

apparent authority: "the exact extent to which the principal held the agent out or permitted him to hold himself out as authorized, and what a prudent person, acting in good faith, under the circumstances would reasonably believe the authority to be." *Bogle v. Ownerrent Rent to Own*, 264 Mont. 515, 519, 872 P.2d 800, 803 (1994) (quoting *Butler Mfg. Co. v. J & L Imp. Co.*, 167 Mont. 519, 527, 540 P.2d 962, 967 (1975)). "[B]oth parts of the test must be met for ostensible authority to exist." *Estate of Pruyn v. Axmen Propane, Inc.*, 2009 MT 448, ¶ 54, 354 Mont. 208, 223 P.3d 845 (emphasis omitted) (citing *Youderian Constr. v. Hall*, 285 Mont. 1, 10, 945 P.2d 909, 914 (1997)).

¶44    Brenden did not offer any evidence to suggest that a prudent person in good faith reasonably would have believed that Glancy had authority to disclose confidential personnel records and information about Brenden after he had resigned his City employment.  The evidence in fact demonstrated that Scott Trent of MRL thought it surprising that Glancy would reveal so much information, as "typically, organizations are somewhat restrictive in what they are willing to share."  Indeed, Glancy already had advised MRL that he could not share additional information when Twiford contacted him for the reference check.  This gets to the heart of Brenden's apparent-authority problem.  The doctrine exists to hold a principal accountable for a "manifestation that clothes the agent with the appearance of authority to act on the principal's behalf and that induces the third party reasonably to believe that the agent acts with actual authority."  Restatement (Third) of Agency, § 7.08 cmt. b.  The third party that would be in a position to make such

31

a claim is MRL, not Brenden. It is not a party and has made no such claim. Brenden cannot assert Glancy's apparent authority to take the City to trial in this case.

¶45 Only one legal inference reasonably may be drawn from the undisputed material facts on this record. The District Court's award of summary judgment to the City should be affirmed.


/S/ BETH BAKER


Chief Justice Mike McGrath and Justice Laurie McKinnon join in the Dissent of Justice Baker.

/S/ MIKE McGRATH
/S/ LAURIE McKINNON