FILED

08/16/2022

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: OP 21-0395

OP 21-0395

IN THE SUPREME COURT OF THE STATE OF MONTANA

2022 MT 166

L.B. individually and on behalf of D.B., a Minor,

       Plaintiff and Appellant,

   v.

UNITED STATES OF AMERICA; BUREAU
OF INDIAN AFFAIRS; DANA BULLCOMING,
agent of the Bureau of Indian Affairs sued in his
individual capacity,

       Defendants and Appellees.

ORIGINAL PROCEEDING:    Certified Question, United States Court of Appeals for the Ninth Circuit, Cause No. 20-35514
Honorable Marsha S. Berzon and Mary H. Murguia, Ninth Circuit Judges, Honorable Danny J. Boggs, Sixth Circuit Judge, sitting by designation

COUNSEL OF RECORD:

     For Appellant:

          Timothy M. Bechtold (argued), Bechtold Law Firm PLLC, Missoula, Montana

          John Heenan, Heenan & Cook, Billings, Montana

     For Appellees:

          Jesse Laslovich, U.S. Attorney, Victoria L. Francis, Timothy A. Tatarka (argued), Assistant U.S. Attorneys, Billings, Montana

     For Amici National Indigenous Women's Resource Center, Sovereign Bodies Institute, Fort Belknap Indian Community and Blackfeet Nation:

          April Youpee-Roll (argued), Munger, Tolles & Olson LLP, Los Angeles, California

Mary Katherine Nagle, Pipestem and Nagle Law, P.C., Tulsa, Oklahoma

Jennifer Weddle, Greenberg Traurig, LLP, Denver, Colorado

For Amici Civil Rights, Women's Rights, and Government Accountability Organizations:

Caitlin Boland Aarab, Boland Aarab PLLP, Great Falls, Montana

Devi Rao, Megha Ram, Roderick & Solange MacArthur Justice Center, Washington, District of Columbia

For Amici Montana Association of Counties and Montana League of Cities and Towns:

Natasha Prinzing Jones (argued), Tracey Neighbor Johnson, Thomas J. Leonard, Boone Karlberg P.C., Missoula, Montana

For Amici American Civil Liberties Union and ACLU of Montana Foundation, Inc.:

Alex H. Rate, ACLU of Montana Foundation, Inc., Missoula, Montana

Steven S. Sparling, Jeffrey L. Braun, Chase Mechanick, Julia A. Quigley, Kramer Levin Naftalis & Frankel LLP, New York, New York

Sandra S. Park, Linda S. Morris, Stephen L. Pevar, American Civil Liberties Union, New York, New York

Argued: April 15, 2022
Submitted: April 19, 2022
Decided: August 16, 2022

Filed:

_____
Clerk

2

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1     The United States Court of Appeals for the Ninth Circuit has submitted the following state law question to this Court:[1]

> Under Montana law, do law-enforcement officers act outside the scope of their employment, as a matter of law, when they use their authority as on-duty officers to sexually assault a person they are investigating for a crime?

We accepted certification by Order dated August 17, 2021.  For the reasons set forth below, our answer is no.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2     In accordance with M. R. App. P. 15(6)(a)(ii), the Ninth Circuit provided the relevant factual and procedural background to the certified question in its Certification Order, which we restate here.

¶3     L.B., a Northern Cheyenne tribal member, lived within the exterior boundaries of the Northern Cheyenne Reservation in Lame Deer, Montana.  On October 30, 2015, L.B. and her mother went to a bar outside the reservation and had a few alcoholic drinks.  After returning home, L.B.'s mother took the truck keys and said she was going for a drive.  L.B. called the police and reported that her mother was driving while intoxicated.

¶4     Bureau of Indian Affairs (BIA) Officer Dana Bullcoming (Officer Bullcoming) responded to L.B.'s call.  Officer Bullcoming determined L.B.'s mother was safe and went to L.B.'s residence.  After entering the residence, Officer Bullcoming asked L.B. whether

---

[1] We have reformulated the certified question pursuant to M. R. App. P. 15(4).

3

she was there alone. L.B. responded that her children were asleep in the other room. L.B. told Officer Bullcoming that she had consumed a few drinks that evening, including half of a beer at her residence. Officer Bullcoming threatened to call social services and arrest L.B. for child endangerment because she was intoxicated while in the presence of her children. *See* Northern Cheyenne Criminal Code § 7-9-6 (1998) (prohibiting intoxication within the exterior boundaries of the Northern Cheyenne Reservation). L.B. pleaded with Officer Bullcoming not to arrest her, citing fears that she would lose her job as a school bus driver.

¶5 Officer Bullcoming took L.B. outside to his patrol vehicle and administered a breathalyzer test, which L.B. recalled indicated a .132 or .136 blood alcohol content. Officer Bullcoming repeatedly told L.B. that "something had to be done." L.B. inferred that Officer Bullcoming did not want to arrest her, so she inquired if by "something needs to be done" he meant "sex." Officer Bullcoming replied affirmatively. L.B. believed that her choices were to go to jail or have sex with Officer Bullcoming. L.B. had unprotected sexual intercourse with Officer Bullcoming in her home. L.B. became pregnant as a result and gave birth to D.B.

¶6 In 2018, L.B. brought a Federal Tort Claims Act (FTCA) suit against the United States, seeking to hold the United States liable for Officer Bullcoming's misconduct.[2] L.B. and the Government filed cross-motions for summary judgment. The Government asserted

---

[2] L.B. also named Officer Bullcoming as a defendant. He failed to answer the complaint and a default judgment was entered against him.

that Officer Bullcoming was not acting within the scope of his employment with the BIA when he sexually assaulted L.B. and, therefore, his actions fell outside the scope of the FTCA's limited waiver of sovereign immunity and grant of jurisdiction. The United States District Court for the District of Montana agreed, granted the Government's motion for summary judgment, and denied L.B.'s cross-motion. The District Court reasoned that, under Montana's respondeat superior case law, the scope of employment includes only an employee's actions made "in furtherance of his employer's interest." Relying on *Maguire v. State*, 254 Mont. 178, 835 P.2d 755 (1992), a respondeat superior case, the District Court concluded that Officer Bullcoming was not acting in furtherance of his employer's interest and therefore was acting outside the scope of his employment when he sexually assaulted L.B. Because the FTCA requires the challenged conduct be within the scope of the actor's employment, the District Court concluded that L.B.'s FTCA claim necessarily failed.

¶7 L.B. appealed to the Ninth Circuit, raising a single issue: whether, under Montana law, Officer Bullcoming's sexual assault of L.B. was within the scope of his employment as a law enforcement officer. Noting that the question was one of first impression under Montana law and presented important public policy concerns, the Ninth Circuit certified the question to this Court.

**STANDARD OF REVIEW**

¶8 M. R. App. P. 15(3) permits this Court to answer a question of law certified to it by another qualifying court. Our review of the certified question is purely an interpretation of the law as applied to the agreed facts underlying the action. *Murray v. BEJ Minerals, LLC*, 2020 MT 131, ¶ 11, 400 Mont. 135, 464 P.3d 80 (citations omitted). The scope of our

5

review is limited to the certified question. *Frontline Processing Corp. v. Am. Econ. Ins. Co.*, 2006 MT 344, ¶ 31, 335 Mont. 192, 149 P.3d 906.

## DISCUSSION

¶9    The common law doctrine of respondeat superior imposes vicarious liability on employers for the tortious conduct of employees committed while acting within the scope of their employment. *Kornec v. Mike Horse Mining & Milling Co.*, 120 Mont. 1, 7, 180 P.2d 252, 256 (1947). The doctrine is designed to hold an employer liable for wrongful conduct by its employees. *Denke v. Shoemaker*, 2008 MT 418, ¶ 79, 347 Mont. 322, 198 P.3d 284. A tortious act occurs within the scope of employment if the act was either expressly or implicitly authorized by the employer or was incidental to an expressly or implicitly authorized act. *Brenden v. City of Billings*, 2020 MT 72, ¶ 14, 399 Mont. 352, 470 P.3d 168. An act not authorized by the employer may nonetheless be within the scope of employment if the act was incidental to the performance of an authorized act and at least partially motivated by the employee's intent or purpose to serve the employer's interest. *Brenden*, ¶ 16.

¶10   Importantly, "[a]n act may be incidental to an authorized act, although considered separately it is an entirely different kind of act." Restatement (Second) of Agency § 229 cmt. b. Thus, the fact that an employer had no reason to expect the employee to perform the act is not conclusive. *See Brenden*, ¶ 16; Restatement (Second) of Agency § 229 cmt. b. An employer may remain liable even where the employee fails in their duty to the principal or disobeys instructions. *Grorud v. Lossl*, 48 Mont. 274, 280, 136 P. 1069, 1071 (1913). "[T]he wrongs for which liability may attach to the principal not only include negligent

6

acts, but malicious, wanton[,] and willful acts as well." *Keller v. Safeway Stores*, 111 Mont. 28, 37, 108 P.2d 605, 611 (1940). Here, Officer Bullcoming's investigation of L.B. for violations related to alcohol consumption were authorized acts of his employment as an officer and agent of the BIA. Undisputedly, governments do not authorize their police officers to sexually assault people when performing these authorized acts. Nevertheless, simply characterizing the act as unauthorized does not answer the question because the doctrine of vicarious liability contemplates the employer's liability for *wrongful* acts of the employee, which could include felonious criminal conduct. Characterization of the act as unauthorized does not necessarily place an officer's sexual assault outside the sphere of employee actions for which the employer may be liable.

¶11   In *Kornec*, we noted acts which are illegal, unauthorized, or disobedient could still result in the employer's vicarious liability if the acts were "so connected with and immediately grow[ing] out of another act of the servant imputable to the master, that both acts are treated as one indivisible tort, which, for the purposes of the master's liability, *takes its color and quality from the earlier* [authorized] *act*." *Kornec*, 120 Mont. at 9, 180 P.2d at 256 (citations omitted, emphasis supplied). We concluded that

> [w]hen a servant in carrying out his assigned duties makes an assault on a third party as a result of a quarrel which arose as a consequence of his performance of the tasks imposed and at the time and place of performance of the duties he was employed to do, then the master is liable.

*Kornec*, 120 Mont. at 9, 180 P.2d at 257. Thus, a tortious and wrongful act, though not authorized or contemplated by the employer, may occur in the scope of employment when the employee, "in carrying out his assigned duties . . . assault[s] a third party as a result of

7

a quarrel which arose as a consequence of [the] performance of the tasks . . . he was employed to do." *Kornec*, 120 Mont. at 9, 180 P.2d at 257; *Brenden*, ¶ 18. We explained the test for liability centered not on "whether the assault was committed in accordance with the master's instructions but whether the act complained of *arose out of and was committed in prosecution of the task the servant was performing for his master*." *Kornec*, 120 Mont. at 9-10, 180 P.2d at 257 (emphasis added). Thus, whether the "employee was acting at least partially in furtherance of the employer's interest does not depend on whether the employer actually profited or benefitted from the act." *Brenden*, ¶ 18 (citations omitted). Even if the employee's act is unauthorized and, the wrongful act *by itself*, is not motivated by any intent or purpose to serve the employer, an employee's tortious act may still be incidental to expressly or implicitly authorized conduct if it is "closely intermingled" with the employment. *Keller*, 111 Mont. at 40, 108 P.2d at 612.

¶12 In assessing whether an act falls outside the scope of employment, the inquiry must focus on the nature of the employment and how the employment relates to the context in which the commission of the wrongful act arose. The test of the employer's liability is whether the act complained of arose out of and was committed in prosecution of the task the servant was performing for his master. *Kornec*, 120 Mont. at 12, 180 P.2d at 258. When tortious acts are so closely associated with the employment that they arose out of and were committed during the furtherance of a task the employee was performing for his employer, they are within the scope of employment, making the employer liable. Therefore, the scope of employment may extend beyond authorized acts to include acts that the employer expressly forbids; that violate the employer's rules, orders, or

8

instructions; that the employee commits for self-gratification or self-benefit; that breach a professional duty; or that are egregious, malicious, or criminal.

¶13 This Court has previously recognized an underlying policy rationale for holding an employer vicariously liable for the tortious conduct of its employees. We held in *Brenden* that vicarious liability for injurious acts made in the furtherance of employment helps prevent recurrence because it "recognizes . . . that the 'ability to exercise control over employees' work-related conduct enables, and provides incentive for, the employer to take measures to reduce the incidence of tortious conduct.'" *Brenden*, ¶ 13. *See also* Restatement (Second) of Agency § 229 cmt. a ("[T]he ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed.").

¶14 "Scope of employment" is a commonly cited principle, but its contours are not rigidly defined. Identifying whether a tortious act falls outside an employee's scope of employment is necessarily fact-intensive.

> An extensive search of authorities has drawn us to the conclusion that the maze of decisions on the subject is the result of a large variety of differing factual situations which in most cases are determinative of the question of whether the agent is acting within the scope of his employment. While the courts are quite harmoniously in accord in their statements of the general rules applicable, their application of those rules has brought about such a diversity of opinions as to make a uniform standard of measurement somewhat difficult to apply.

*Keller*, 111 Mont. at 37, 108 P.2d at 610-11. These certified facts likewise present a similar challenge here.

9

¶15     We have previously adopted and applied several factors of the Restatement
(Second) of Agency § 229 to determine the scope of employment. *Keller*, 111 Mont. at
36-37, 108 P.2d at 610. To the extent that any factor may be helpful in determining the
scope of employment, we adopt Restatement § 229 in its entirety. Restatement § 229,
entitled "Kind of Conduct Within Scope of Employment," provides the following factors
to determine whether conduct, although not authorized, may be similar or incidental to the
conduct authorized thus making it within the scope of employment:

> (a) whether or not the act is one commonly done by such servants;
> (b) the time, place and purpose of the act;
> (c) the previous relations between the master and the servant;
> (d) the extent to which the business of the master is apportioned between different servants;
> (e) whether the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
> (f) whether or not the master has reason to expect that such an act will be done;
> (g) the similarity in quality of the act done to the act authorized;
> (h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;
> (i) the extent of departure from the normal method of accomplishing an authorized result; and
> (j) whether or not the act is seriously criminal.

Restatement (Second) of Agency § 229. While no one factor is dispositive, each factor
requires an inquiry into how the employment relates to the context in which the
commission of the wrongful act arose. Such an inquiry mandates that the wrongful "act"
referred to in the factors be accurately identified. Here, the "act" Officer Bullcoming
committed was not sexual intercourse without consent—L.B. agreed to have sexual

intercourse with Officer Bullcoming in return for not being charged.[3] The unauthorized "act" Officer Bullcoming committed and for which he subsequently pleaded guilty was a violation of 18 U.S.C. § 242; that is, "under color of [] law, statute, ordinance, regulation, or custom, [Officer Bullcoming] willfully subject[ed] [L.B] . . . to the deprivation of [her] rights. . . ."[4] Therefore, carefully and accurately identifying the nature of the unauthorized "act" establishes the context in which it arose and whether it "arose out of and was committed in prosecution of the task the servant was performing for his master." *Kornec*, 120 Mont. at 10, 180 P.2d at 257.

¶16 The context in which the wrongful act arose is also informed by the nature of the employment itself; that is, the activities, responsibilities, and authority that an employer delegates to its employees through a particular employment and which constitute authorized acts. Hence, the inquiry of whether authority inherent in the employment was abused to accomplish a wrongful act must be made any time an employer delegates authority to its employees and, as such, the inquiry is not unique to law enforcement. Police officers are assigned law-enforcement and community-protection duties which include the authority to detain, arrest, frisk, search, seize, and even use deadly force when necessary.

---

[3] In 2019, the definition of "consent" was modified to include a provision that a "victim is incapable of consent" when the victim is "a witness in a criminal investigation or a person who is under investigation in a criminal matter and the perpetrator is a law enforcement officer who is involved with the case in which the victim is a witness or is being investigated." *See* § 45-5-501(1)(b)(xi), MCA.

[4] After a paternity test proved he impregnated L.B., Officer Bullcoming pled guilty to 18 U.S.C. § 242, deprivation of rights under color of law, and was sentenced to three years in the custody of the U.S. Bureau of Prisons.

Broadly, the job duties of law enforcement officers include initiating nonconsensual, and at times invasive, physical contact with members of the public pursuant to law enforcement goals. *See, e.g.*, *Mitchell v. Wisconsin*, ___ U.S. ___, ___, 139 S. Ct. 2525, 2538-39 (2019) (plurality) (permitting warrantless blood tests on unconscious drivers pursuant to drunk-driving investigations); *Mullenix v. Luna*, 577 U.S. 7, 19, 136 S. Ct. 305, 312 (2015) (per curiam) (granting qualified immunity to an officer who fired six shots at a fleeing felon's vehicle, killing the driver); *Maryland v. King*, 569 U.S. 435, 465-66, 133 S. Ct. 1958, 1980 (2013) (permitting DNA cheek swabs as part of police booking procedures); *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 324, 132 S. Ct. 1510, 1514 (2012) (describing and permitting strip searches requiring inmates to "lift [their] genitals, turn around, and cough in a squatting position as part of the process"); *Terry v. Ohio*, 392 U.S. 1, 17 n. 13, 88 S. Ct. 1868, 1877 (1968) (describing the physically invasive nature of patdowns). Thus, policing commonly involves invasive physical contact. This Court has previously acknowledged that "[t]o create liability for a battery by a servant upon a third person, the employment must be one which is likely to bring a servant into conflict with others." *Kornec*, 120 Mont. at 10, 180 P.2d at 257. It is therefore foreseeable that a police officer will have invasive physical contact with persons they are investigating. Hence, the scope of a police officer's employment contemplates physical contact, whether wrongfully or appropriately exercised.

¶17 Further, police officers wear visible signs of this employer-conferred authority—a marked car, uniform, badge, and weapons—which officers use to carry out their employment duties. These duties frequently authorize and involve entering homes,

12

detaining criminal suspects at gunpoint, placing suspects in handcuffs and into police vehicles, and subjecting them to forceful, nonconsensual, and offensive contact. With these considerable and intimidating powers comes an inherent risk of abuse, as our jurisprudence on searches, seizures, and consent reveals. When the abuse is a tortious act arising from the police officer's employment activities, it falls to the trier of fact to determine whether it is within the scope of employment for which the employer is liable. Thus, if an on-duty police officer obtains consent by misusing official authority, the wrongful act may be within the scope of employment if it arose out of the employment and was at least partially motivated by an intent or purpose to serve the interests of his employer. *Brenden*, ¶¶ 14, 16 (citing *Kornec*, 120 Mont. at 8-12, 180 P.2d at 256-58; *Keller*, 111 Mont. at 36-40, 108 P.2d at 610-12).

¶18     The question of law for this Court to decide is whether Officer Bullcoming's threat of charging L.B. with a criminal offense to obtain her consent to sexual intercourse was so disconnected from his employment activities that a trier of fact could not find that his wrongful conduct arose out of and was committed in furtherance of Officer Bullcoming's criminal investigation—the authorized task he was performing for his BIA employer. *See Kornec*, 120 Mont. at 12, 180 P.2d at 258. We hold that Officer Bullcoming's wrongful conduct was not so disconnected from his employment.

¶19     While an employee's actions only come within the scope of employment if they are motivated in part by a desire to serve the employer to an appreciable extent, an employee may act with a mixed motive. *Brenden*, ¶¶ 17-18. The Government's argument that Officer Bullcoming could not have been motivated to serve the BIA's interests assumes

13

that when Officer Bullcoming used his position as a BIA officer to obtain L.B.'s consent, he was not in some way motivated to serve the BIA's interests. The Government does not support this proposition but asks this Court to accept it as axiomatic. However, here, the certified facts could lead a trier of fact to conclude that Officer Bullcoming abused his employer-conferred power and authority to sexually assault L.B. Officer Bullcoming was on-duty and was dispatched to investigate a DUI involving L.B.'s mother. He entered L.B.'s home, inquired if she was alone, took her to his patrol car, administered a BIA-owned breathalyzer test, accused her of being intoxicated, threatened her with arrest, and threatened to contact social services and have her children removed. Even if some of Officer Bullcoming's motive was "self-interest," he was there to investigate the interests of his employer—acting as an officer and agent of the BIA investigating a crime—when he used his employer-conferred powers to sexually assault L.B. Officers have significant police discretion to enforce certain laws and to let civilians off with a warning. This discretion benefits the law enforcement agency and ultimately the taxpayers by keeping certain violations out of the criminal justice system and freeing up government resources. When an officer tells a law-breaking civilian he will let her go as long as she, for example, repairs her windshield, replaces her tail-light, promises not to repeat the same unlawful conduct, or offers to give up a criminal associate, he does so, in part, to benefit his employer. Similarly, when an officer intimidates a civilian through, for example, the use-of-force or the threat of force, he provides a benefit to his employer by maintaining law and order in the community. The certified facts could lead a trier of fact to conclude that Officer Bullcoming's wrongful conduct was predicated upon and incident to his

14

employment as a BIA officer. The Dissent claims that any evidence of a "mixed" or "dual motive" is purely speculative. But it is no more speculative to suggest that Officer Bullcoming acted, in part, to further the BIA's interests than it is to presume that he acted "for his own personal gratification." Dissent, ¶ 38 (emphasis omitted). There is no explicit evidence of this in the certified facts, yet the Dissent accepts as self-evident that any person who coerces another into unlawful sexual activity does so "solely" for his own personal sexual gratification. Dissent, ¶ 38. Our precedents indicate that when two or more reasonable inferences may be drawn regarding the scope of employment, the question is one left for the trier of fact. *See Bowyer v. Loftus*, 2008 MT 332, ¶ 8, 346 Mont. 182, 194 P.3d 92. The certified facts indicate that, under our respondeat superior jurisprudence, reasonable minds could differ regarding Officer Bullcoming's motives.

¶20 Amici and L.B. argue there is systemic misconduct within the BIA and violence against Native American women on reservations, referring this Court to *United States v. Bryant*, 579 U.S. 140, 144, 136 S. Ct. 1954, 1959 (2016) (noting that "American Indian . . . women are 2.5 times more likely to be raped or sexually assaulted than women in the United States in general" (internal punctuation and citations omitted)). The certified facts establish that L.B. believed Officer Bullcoming's statement that "something had to be done" referred to sex. This illustrates her belief in and understanding of the power dynamic at play, which, also under the certified facts, was between a BIA officer and Northern Cheyenne resident. L.B. has established that her case should not be dismissed as a matter of law and that she should have the opportunity to present evidence to a trier of fact in support of her contention that Officer Bullcoming was acting within the scope of

15

his employment when he threatened her with criminal charges if she did not consent to having sexual intercourse with him. What evidence L.B. chooses to present to prove her allegations will be up to her, but there is no state-law bar to her claim.

¶21 The parties devote extensive briefing to the applicability of *Maguire*. The United States contends *Maguire* is dispositive of L.B.'s claim, while L.B. urges us to overrule *Maguire*. *Maguire*, however, fails to answer the certified question for several reasons. First, the scope of employment was not at issue in *Maguire*. Rather, noting in conclusory fashion that sexual assault was outside the scope of employment, the Court addressed the central issue on appeal: the applicability of the nondelegable duty exception to the respondeat superior doctrine. *Maguire*, 254 Mont. at 184-85, 835 P.2d at 760. Liability under the nondelegable duty exception may cover conduct *outside* the scope of employment, and *Maguire* declined to extend this exception and § 214 of the Restatement (Second) of Agency beyond inherently dangerous activities. *Maguire*, 254 Mont. at 184-85, 835 P.2d at 759. While acknowledging the respondeat superior doctrine as a precursor to reaching the exception, the Court did not meaningfully consider factors relevant to determining whether a tortious act fell outside the scope of employment, a different consideration altogether. Accordingly, *Maguire* does little to inform the scope of a law enforcement officer's employment.[5]

---

[5] The Government relies on *United States v. Olson*, 546 U.S. 43, 126 S. Ct. 510 (2005), to argue its waiver of sovereign immunity under the FTCA extends only to when there would be liability of a "private person" for the acts of employees and that liability may not be premised upon an entity's government status. The Government's argument is based upon its conclusion that *Maguire* presents a bar to L.B.'s claims. However, because we distinguish *Maguire* and conclude it is not

16

¶22    Further, and notwithstanding the inapplicability of *Maguire*, the factual record here is distinguishable.    *Maguire* involved the sexual assault of an intellectually and developmentally disabled individual by her caretaker, an employee of the State.  *Maguire*, 254 Mont. at 181, 835 P.2d at 757.  *Maguire* lacked evidence of threats, quid pro quo coercion by the orderly, or even whether the sexual assault arose out of his employment—indeed, the record contained no factual background concerning the assault whatsoever.  *Maguire*, 254 Mont. at 180-81, 835 P.2d at 757.  The factual record in *Maguire* required no development on this issue because scope of employment was not at issue.  Moreover, the sexual assault in *Maguire* concerned an individual incapable of consent in any circumstance.  *See* § 45-5-501(1)(b)(i), MCA.  Thus, whether the act fell within the scope of his employment failed to change the calculus—it would have been sexual assault regardless of whether it was committed by her caretaker or a stranger.  Conversely, the record here contains evidence concerning the circumstances under which L.B.'s sexual assault by Officer Bullcoming occurred.  Officer Bullcoming was only in L.B.'s home by virtue of his status as a BIA officer.  L.B. was otherwise capable of consent, but for Officer Bullcoming's coercive threats.  It is unlikely that the statement "something had to be done" uttered by anyone without law enforcement or similar authority would have the same coercive weight and connotations as when Officer Bullcoming uttered those words, repeatedly, to L.B.  *Maguire* thus remains factually distinct.

---

dispositive of the issue, we decline to further address the Government's argument and the applicability of *Olson*.

17

¶23 Finally, *Maguire* proves inapplicable because the certified question does not ask whether the government may be liable under the nondelegable duty exception to acts occurring outside the scope of employment. Rather, we must address whether an employee's sexual assault of a member of the public while purportedly acting as an agent of his employer constitutes behavior at the heart of the respondeat superior doctrine itself—tortious conduct within the scope of employment.

¶24 Likewise, our holding in *Paull v. Park Cty.*, 2009 MT 321, 352 Mont. 465, 218 P.3d 1198, has limited application here. While we adopted the Restatement (Second) of Agency § 214, without limitation, our antecedent analysis concluded the State owed Paull a statutory duty arising out of the Interstate Compact for Adult Offender Supervision and thus was in a "continuing relationship" with Paull, which we concluded was a nondelegable duty. *Paull*, ¶¶ 34-38. *See also Smith v. Ripley*, 446 F. Supp. 3d 683, 691 n. 5 (D. Mont. 2020) (applying *Paull* by conducting a two-part analysis of Montana statutory law and the ensuing relationship arising out of a statutory duty); *Shepherd v. Amtrak*, 2018 U.S. Dist. LEXIS 226726 at *4-5 (D. Mont. Aug. 15, 2018) (applying the common carrier exception of Restatement (Second) Agency § 214 as adopted by *Paull*). The FTCA imparts liability upon the United States only for actions "of any employee of the Government while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b)(1). Our analysis thus focuses on whether Officer Bullcoming's sexual assault falls outside the scope of his employment, an issue on which *Paull* and *Maguire* have no bearing.

¶25 Well-established case law guides our decision today, with an understandably needed clarification of *Maguire* and *Paull* in the context of the certified facts. We expressly note

18

the consistency of our case law with the Legislature's decision to hold an employer responsible for an employee's wrongs. Section 28-10-602(1), MCA, establishes that "a principal is responsible to third persons for the . . . *wrongful* acts committed by the agent *in and as a part of the transaction of business*, and for the agent's *willful* omission to fulfill the obligations of the principal." (Emphasis added.) Notwithstanding, the Legislature also provided "a principal is not responsible for *other* wrongs committed by the principal's agent *except those mentioned in subsection (1)* unless the principal has *authorized* or ratified the acts, even though committed while engaged in the principal's services." Section 28-10-602(2), MCA (emphasis added). We draw on our established jurisprudence to inform the question of when a wrongful act is considered "[with]in and as a part of the transaction of business." We similarly draw on our established precedent to inform the question of what constitutes an "authorized" act. In *Keller*, decided in 1940, and *Kornec*, decided in 1947, and precedent thereafter, we set forth the relevant factors for determining the scope of employment. For over 80 years, the general test of an employer's liability has been whether the act complained of arose out of and was committed in prosecution of the task the servant was performing for his master. *Kornec*, 120 Mont. at 12, 180 P.2d at 258; Opinion, ¶ 12. While our precedent has explained the formula within the factual contours of different cases, those cases make clear that whether a tortious act falls outside the scope of employment will depend on the facts of the case and is not easily disposed of as a matter of law. We conclude that whether Officer Bullcoming acted outside the scope of his employment when he used that employment as a vehicle to obtain L.B.'s consent to

19

sexual intercourse must be answered by the trier of fact, with the guidance of the principles set forth herein.

## CONCLUSION

¶26    Our answer to the certified question is that law-enforcement officers do not, as a matter of law, act outside the scope of their employment when they use their authority as on-duty officers to sexually assault a person they are investigating for a crime. The test of an employer's liability is whether the act complained of arose out of and was committed in prosecution of the task the officer was performing for his employer. Accordingly, in any case evaluating whether an act falls outside the scope of employment, the inquiry must be on the nature of the employment and how the employment relates to the context in which the commission of the wrongful act arose. We reject the United States' argument that *Maguire* bars L.B.'s claims as a matter of law. The certified facts establish that Officer Bullcoming was not, as a matter of law, acting outside the scope of his employment when he sexually assaulted L.B. and the question is one for a trier of fact.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA

Justice Dirk Sandefur, dissenting.

¶27     I dissent.  For over 125 years, generally-applicable legal standards for determining whether, for purposes of vicarious employer liability, an employee's unauthorized tortious conduct was committed or engaged in within the course or scope of his or her employment have been clearly, concisely, and consistently defined under Montana statutory and common law.  *See, e.g.*, § 28-10-602, MCA (first enacted as Montana Civil Code §§ 3118 and 3119 (1895));[1] *Brenden v. City of Billings*, 2020 MT 72, ¶¶ 13-31, 399 Mont. 352, 470 P.3d 168; *Kornec v. Mike Horse Mining & Milling Co.*, 120 Mont. 1, 7-12, 180 P.2d 252, 256-57 (1947); *Keller v. Safeway Stores*, 111 Mont. 28, 35-40, 108 P.2d 605, 610-12 (1940); *Harrington v. H.D. Lee Mercantile Co.*, 97 Mont. 40, 59, 33 P.2d 553, 558 (1934); *Hoffman v. Roehl*, 61 Mont. 290, 295-300, 203 P. 349, 349-51 (1921); *Kirk v. Mont. Transfer Co.*, 56 Mont. 292, 297-99, 184 P. 987, 988-89 (1919); *Ellinghouse v. Ajax Livestock Co.*, 51 Mont. 275, 286-87, 152 P. 481, 484-85 (1915).  Today, however, the Court erroneously applies our heretofore clear and consistent respondeat superior precedent in a result-oriented manner to reach a desired ad hoc result:  holding the federal government financially liable to an innocent victim for the outrageous tortious criminal conduct of a rogue federal law enforcement officer.  The Court's application of the

---

[1] Section 28-10-602(1), MCA, is merely "declaratory of the common law" doctrine of respondeat superior.  *Harrington v. H.D. Lee Mercantile Co.*, 97 Mont. 40, 59, 33 P.2d 553, 558 (1934) (construing § 7965, RCM (1921)); *Hoffman v. Roehl*, 61 Mont. 290, 297, 203 P. 349, 350 (1921) (construing § 5450, RCM (1907)).  *Accord Brenden v. City of Billings*, 2020 MT 72, ¶ 13 n.2, 399 Mont. 352, 470 P.3d 168; *Kornec v. Mike Horse Mining & Milling Co.*, 120 Mont. 1, 7, 180 P.2d 252, 256 (1947) (citing §§ 7965-66, RCM (1935)); *Keller v. Safeway Stores*, 111 Mont. 28, 35-36, 108 P.2d 605, 610 (1940) (citing §§ 7965-66, RCM (1935)); Restatement (Third) of Agency § 2.04 Reporter's Note a (Am. Law Inst. 2006) (construing § 28-10-601, MCA).

pertinent Montana law is patently erroneous in the manifest absence of any record evidentiary basis upon which the finder of fact could reasonably conclude that the officer was acting with any motive or purpose other than for his own personal sexual gratification.

    A. Long Established Montana Employee Purpose/Motive Theory of Vicarious Liability for Unauthorized Tortious Acts of Employees.

¶28    "Distinct from direct liability for an employer's own [negligent] conduct, the common law doctrine of respondeat superior imposes vicarious liability on employers for the tortious conduct of employees committed while acting within the scope of their employment." *Brenden*, ¶ 13 (citing *Kornec*, 120 Mont. at 7, 180 P.2d at 256; *Keller*, 111 Mont. at 35, 108 P.2d at 610; Restatement (Third) of Agency §§ 2.04, 7.03(2)(a), and 7.07 (Am. Law Inst. 2006)).[2]  As the jump-off point for its errant application of our long and well settled Montana vicarious employer liability standards, the Court misleadingly quotes isolated language from our 1940 *Keller* decision to the effect that the "diversity of" the various outcomes that result from application of those generally applicable standards to the myriad of case-specific fact patterns has rendered "a uniform standard of measurement somewhat difficult to apply." Opinion, ¶ 14 (quoting *Keller*, 111 Mont. at 37, 108 P.2d at 610).  After laying out what can at best be characterized as a wandering, result-oriented

_____

[2] In contrast to vicarious employer liability in respondeat superior, negligence is, of course, a distinct theory of direct employer liability. *See Brenden*, ¶ 13 (distinguishing vicarious employer liability in respondeat superior from direct theories of liability for employer's own negligence); Restatement (Third) of Agency § 7.07 cmt. b (the more direct and applicable theory of employer liability is negligence "when tortious conduct by employees is reasonably foreseeable by [the] employer"). I thus concur with the Court that neither *Paull v. Park Cty.*, 2009 MT 321, 352 Mont. 465, 218 P.3d 1198, nor *Maguire v. State*, 254 Mont. 178, 835 P.2d 755 (1992), have any dispositive bearing in this case to the extent that the specific theories of employer liability at issue in those cases were alleged breaches of employer non-delegable duties of care.

analytical framework, the Court then essentially concludes that the answer to the Ninth Circuit's question of law should be left to ad hoc jury determination based on the particular facts of this case because "whether a tortious act falls outside the scope of employment . . . is not easily disposed of as a matter of law." Opinion, ¶ 24. Not so.

¶29 As a preliminary matter, most, if not all, generally applicable legal standards, such as, for example, the reasonable care standard in negligence cases, have broad and generally applicable legal meaning suitable for flexible but consistent application to the myriad of case-specific factual circumstances that necessarily vary widely from case to case. As with other generally applicable legal standards, the suitability of our generally applicable *scope of employment* standard, and its *course of employment* synonym, for flexible application to a wide variety of case-specific fact patterns does not render it "difficult to apply," whether by the trier of fact or by the court as a matter of law in accordance with the clear and concise evidentiary standard set forth in Fed. R. Civ. P. 56 or M. R. Civ. P 56, as applicable. Like other ultimate legal standards of general applicability, the course or scope of employment standard has definite and consistent meaning when properly viewed and applied as a function of the well settled legal standards that go with it. Courts may then easily apply those standards to the particular facts and circumstances of a particular case *as a matter of law* where, as here, the Rule 56 factual record manifests no genuine issue of material fact on an essential element of factual proof.[3]

---

[3] Under M. R. App. P. 15(3), the pertinent evidentiary record here narrowly consists of the stipulated facts stated in the Ninth Circuit's certified question which directly derive from and are coextensive with the underlying Fed. R. Civ. P. 56 factual record in *L.B. v. United States*, No. CV-18-74-BLG-SPW (D. Mont. Aug. 28, 2019), and the underlying *L.B. v. United States*, No.

¶30 Even prior to 1940, we recognized that the traditional common law course or scope of employment standard of vicarious employer liability was "well settled in this state." *Staff v. Mont. Petroleum Co.*, 88 Mont. 145, 153-54, 291 P. 1042, 1045 (1930) (citing *Ellinghouse*, 51 Mont. at 285; 152 P. at 485). In that regard, the overarching legal standard or test for whether an employee committed or engaged in the tortious conduct at issue (regardless of whether negligent, willful, malicious, or criminal) while acting within the course or scope of his or her employment is whether the subject act or conduct was "either expressly or implicitly authorized by the employer" or, if not, whether the employee nonetheless performed or engaged in the unauthorized act or conduct "*incidental to* the performance of an expressly or implicitly authorized act" *and* was "at least *partially motivated by* the employee's *intent or purpose to serve* the *employer's interest*." *Brenden*, ¶¶ 14 and 16 (citing *Kornec*, 120 Mont. at 9-10, 180 P.2d at 256-57; *Keller*, 111 Mont. at 36-40, 108 P.2d at 610-12; Restatement (Third) of Agency § 7.07(2) cmt. b; Restatement (Second) of Agency §§ 228(1)(a), (c), and 229(1) (Am. Law Inst. 1958)—emphasis added). *Accord Harrington*, 97 Mont. at 59-62, 33 P.2d at 558-59; *Hoffman*, 61 Mont. at 298-300, 203 P. at 350-51; *Kirk*, 56 Mont. at 297-98, 184 P. at 988; *Ellinghouse*, 51 Mont. at 285-89, 152 P. at 485-86. *See also* Restatement (Third) of Agency § 2.04 cmt. a and § 7.07(2) (including cmts. b-c); Restatement (Second) of Agency §§ 228(1)(c), (2), 229, and 235; Restatement (First) of Agency §§ 228, 229, and 235 (Am. Law Inst. 1933). Depending

CV 18-74-BLG-SPW-TJC (D. Mont. July 16, 2019). *See L.B. v. United States*, 8 F.4th 868, 869-70 (9th Cir. 2021).

24

upon the circumstances, the scope of unauthorized tortious acts for which an employer may be vicariously liable may include not only negligent conduct but that which is willful, malicious, and even criminal. *Brenden*, ¶ 16 (citing *Kornec*, 120 Mont. at 7-8, 180 P.2d at 256; *Keller*, 111 Mont. at 38, 108 P.2d at 611).

¶31 The first prong of the test for whether an employee committed or engaged in a particular unauthorized act or type of conduct within the scope or course of his or her employment—i.e., whether he or she committed or engaged in the unauthorized act or conduct *incidental to* an expressly or implicitly authorized act or conduct—requires proof that the unauthorized act or conduct both *"arose out of"* and was *"closely related to,"* or *"intermingled with,"* the "performance of an expressly or implicitly authorized act or function." *Brenden*, ¶¶ 16 and 27 (citing *Kornec*, 120 Mont. at 9-10, 180 P.2d at 256-57; *Keller*, 111 Mont. at 40, 108 P.2d at 612—internal punctuation omitted and emphasis added); *Keller*, 111 Mont. at 40, 108 P.2d at 612 (noting existence of a genuine issue of material fact as to whether the subject employee conduct was "so closely intermingled with the employment [the employee] was . . . authorized to do"—emphasis added). Thus, an authorized act or conduct may have been committed or engaged in *incidental to* an authorized act "even [if] an entirely different kind of an act." *Brenden*, ¶ 16 (quoting Restatement (Second) of Agency § 229 cmt. b—internal punctuation omitted). Factual considerations relevant to whether an unauthorized employee act or conduct was committed or occurred *incidental to* (i.e., *arose out of* and was *closely related to or intermingled with*) an expressly or implicitly authorized act or conduct include, *inter alia*:

(1)     "whether or not the act is one commonly done by such servants";

(2)     "the time, place[,] and purpose of the act";

(3)     "the previous relations between the master and the servant";

(4)     "whether . . . the act is outside the enterprise of the master";

(5)     "the similarity in quality of the act done to the act authorized";

(6)     "the extent of departure from the normal method of accomplishing an authorized result"; and

(7)     "whether or not the act is seriously criminal."

Restatement (Second) of Agency § 229(2)(a)-(c), (e), (g), and (i)-(j). *See also Keller*, 111 Mont. at 36-37, 108 P.2d at 610 (quoting Restatement (First) of Agency § 229(1), (2)(a), (b), (f), and (i)).[4]

¶32     The second prong of the test for whether an unauthorized employee act or conduct was committed or engaged in within the course or scope of the subject employment requires proof by direct or circumstantial evidence that the employee performed or engaged in the unauthorized tortious act or conduct at least in part with a motive or purpose to serve or further the employer's interest. *Brenden*, ¶ 16 (citing *Kornec*, 120 Mont. at 9-10, 180 P.2d at 256-57; *Keller*, 111 Mont. at 36-40, 108 P.2d at 610-12; Restatement (Third) of

[4] Other relevant factors depending upon the circumstances at issue in a particular case include, *inter alia*, "the extent to which the business of the master is apportioned between different servants," whether the master has "entrusted [the act] to any servant" if "within the [master's] enterprise," whether "the master has reason to expect that such an act will be done," and whether "the instrumentality by which the harm is done has been furnished by the master to the servant." Restatement (Second) of Agency § 229(2)(d)-(e), (f), and (h). Note further that Restatement (First) of Agency § 229 is identical to Restatement (Second) of Agency § 229 and, as stated in its Reporter's Note a, Restatement (Third) of Agency § 7.07 "is a consolidated treatment of topics covered in several separate sections of Restatement Second of Agency" including §§ 228, 229, and 235, *inter alia*.

26

Agency § 7.07(2) cmt. b; Restatement (Second) of Agency §§ 228(1), (c), and 229(1)). *Accord Kornec*, 120 Mont. at 11, 180 P.2d at 257 (holding that sufficient evidence was present to support a jury finding that the subject unauthorized tortious act was committed by the employee "while *engaged in* his master's business *and in furtherance of* [the master's] business and . . . interest"—emphasis added); *Kirk*, 56 Mont. at 298, 184 P. at 988 ("[t]he tort of an agent is within the course of his employment where the agent, in performing it, is endeavoring to promote the principal's business"—quoting 2 Corpus Juris 853, as later quoted in *Keller*, 111 Mont. at 39, 108 P.2d at 611); *Ellinghouse*, 51 Mont. at 288, 152 P. at 485 (ultimate question in whether subject employee was "acting within the scope of the[] employment" is whether "he [was] acting *in furtherance of his master's business*"—emphasis added). In other words, the second prong of the test for whether the unauthorized act or conduct of an employee was performed or occurred within the course or scope of the subject employment requires direct or circumstantial proof that the employee "at least partially intended" the unauthorized tortious act or conduct "*as a means to accomplish*" an expressly or implicitly authorized task, purpose, or function. *Brenden*, ¶ 27 (citing *Keller*, 111 Mont. at 40, 108 P.2d at 612—emphasis added). *Accord* W. Page Keeton, et al., *Prosser & Keeton on Torts* § 70, 503 (5th ed. 1984) ("no matter how specific, detailed, and emphatic" the employer's instructions "have been to the contrary" the employer is vicariously liable if the circumstances indicate that the unauthorized act or conduct was "merely the servant's own way of accomplishing an authorized purpose"). A "dual or mixed motive" or purpose for engaging in the unauthorized act or conduct at issue thus does not preclude a finding that the unauthorized act or conduct was committed or

27

occurred within the course or scope of the subject employment. *Brenden*, ¶¶ 17-18 (internal citations omitted). The fact that the employee's "predominant motive" or purpose may have been to further his or her own independent self-interest does not preclude a finding that the unauthorized act or conduct of an employee was performed or occurred within the scope or course of the subject employment as long as there is sufficient evidence upon which to reasonably conclude that the employee at least partially intended the unauthorized tortious act or conduct as a means to accomplish an expressly or implicitly authorized task, purpose, or function. *Brenden*, ¶ 17 (internal citations omitted). *See also Kornec*, 120 Mont. at 11, 180 P.2d at 257 (holding that sufficient evidence was present to support a jury finding that employee assaulted the third party "in furtherance of" accomplishing the authorized task).

¶33   In contrast, however, independent acts or conduct "not intended" by the employee "to serve *any* purpose of the employer" are *not* within the course of his or her employment. *Brenden*, ¶¶ 17-18 (citing Restatement (Third) of Agency § 7.07(2) cmt. b; *Keller*, 111 Mont. at 37-38, 108 P.2d at 611). An employee's "*personal motive*[]" or purpose *takes the tortious act beyond the scope of employment* where it is clear that the employee "could not have been directly or indirectly serving his master" in any regard. *Keller*, 111 Mont. at 37-38, 108 P.2d at 611 (emphasis added).

> If the servant *steps outside* of *his employment* to do *some act for himself, not connected with the master's business*, there is no more responsibility for what he does than for the acts of a stranger. If he has *no intention, not even in part, to perform* [*that act*] *for the employer*, but intends *only to further a personal end*, his act is not within the scope of the employment. . . . [I]f he acts from *purely personal motives*, . . . he is considered . . . to have *departed*

*from his employment*, and the *master is not liable . . .* unless some non-delegable duty [applies].

W. Page Keeton, et al., *Prosser & Keeton on Torts* § 70, 503 and 505-07 (5th ed. 1984) (emphasis added).

> When an employee commits a tort with the sole intention of furthering the employee's own purposes, and not any purpose of the employer, it is neither fair nor true-to-life to characterize the employee's action as that of a representative of the employer. The employee's intention severs the basis for treating the employee's act as that of the employer in the employee's interaction with the third party.

Restatement (Third) of Agency § 7.07 cmt. b. *Accord Kornec*, 120 Mont. at 8, 180 P.2d at 256 (employee "who acts entirely for his own benefit" is not acting in the scope of his employment—internal citation omitted); *Keller*, 111 Mont. at 37-38, 108 P.2d at 611 (a negligent, malicious, or willful act is *not* within the scope of the subject employment if "animated purely by [the] personal motives or desires" of the employee—internal citations omitted); *Harrington*, 97 Mont. at 59-60, 33 P.2d at 558 (no vicarious employer liability in respondeat superior under § 7965, RCM (1921) (now § 28-10-602(1), MCA), for unauthorized tortious acts where the employee "was not acting . . . *in the furtherance of his principal's business*" but "independently of his employer . . . [upon] missions or purposes of his own"); *Hoffman*, 61 Mont. at 298-99, 203 P. at 349-50 (no vicarious employer liability where the servant "acted independently . . . upon [a] mission[] or purpose[] of his own . . . for the [exclusive] purpose of doing something which had no connection with the servant's duty"—master is not liable "where the servant steps aside from his master's business, . . . [even] for a short space of time, and does [a harmful] act not connected with the business . . . [because] the relation of master and servant does not . . . exist" at that

29

time); *Ellinghouse*, 51 Mont. at 287-88, 152 P. at 485 ("[a] servant may abandon his master's employment for the time to accomplish some purpose of his own" and, "[i]f in accomplishing this purpose he does an injury to another, his master is not liable"); Restatement (Third) of Agency § 7.07(2) (employee conduct is "not within the scope of employment when it occurs within an independent course of conduct not intended . . . to serve any purpose of the employer"); Restatement (Second) of Agency § 228(2) ("[c]onduct of a servant is *not* within the scope of employment" if not "actuated by a purpose to serve the master"—emphasis added); Restatement (Second) of Agency § 230 cmt. c ("[c]onduct is not within the scope of employment if it has no connection with the act which the employee is required to perform"); Restatement (Second) of Agency § 235 (an act is not within the scope of employment if performed "with no intention to perform it as a part of or incident to a service on account of which he [or she] is employed"). *See similarly* Restatement (First) of Agency §§ 228 and 235.

¶34    Whether an employee intended the unauthorized tortious conduct at issue at least in part as a means to accomplish an expressly or implicitly authorized employment purpose, task, or function is generally "a question of fact . . . under the totality of the circumstances" in each case. *Brenden*, ¶ 18 (internal citations omitted). The trial court may make that determination as a matter of law, however, based on pertinent facts and circumstances beyond genuine material dispute. M. R. Civ. P. 56(c)(3) and (d)(1); *Keller*, 111 Mont. at 36, 108 P.2d at 610 (question of law "in plain and palpable cases"); Restatement (Second) of Agency § 228 cmt. d. In either event, "[t]he state of mind of the employee is

30

determinative." *Brenden*, ¶ 18 (citing Restatement (Third) of Agency § 7.07 cmt. b; Restatement (Second) of Agency § 235 cmt. a).

B. Erroneous Application of Montana Respondeat Superior Standards Here.

¶35 The tortious conduct at issue here is the BIA officer's abuse of his official authority by expressly or implicitly threatening L.B. with arrest and criminal prosecution with the intent and purpose to coerce her into engaging in sexual intercourse with him. Opinion, ¶¶ 15 and 18. It is beyond dispute that there is no basis on the stipulated facts upon which to reasonably conclude that the BIA expressly or implicitly authorized the officer's conduct. Consequently, under long established Montana law, *supra*, the officer's employer (the United States government) may be vicariously liable for his tortious conduct only upon direct or circumstantial evidence, and resulting findings of fact, that:

(1)     the officer's unauthorized use of his official authority to coerce L.B. into engaging in sexual intercourse both *arose out of* and was *closely related to*, or *intermingled with*, the performance of an expressly or implicitly authorized act or function; *and*

(2)     the officer used his authority to coerce L.B. to engage in sexual intercourse at least in part *as a means to accomplish* an expressly or implicitly *authorized* official task, purpose, or function *rather than solely for his own personal purpose or benefit*.

¶36 Under the first prong of the test here, the pertinent expressly or implicitly authorized employment task or function was the officer's duty to respond to and investigate L.B.'s report of possible criminal conduct involving her mother (driving while under the influence of alcohol (DUI)). Ancillary to that duty, the officer was further authorized to investigate and act appropriately on any indication of other criminal activity that he might thereafter discover. In that regard, based on his observation of L.B. and her admission of prior

31

drinking that evening, the officer expressed his belief that she was intoxicated while in the custody of her sleeping children, both in violation of the Northern Cheyenne Criminal Code prohibitions of intoxication and endangering the welfare of children. When confirmatory field testing indicated that she had a blood-alcohol content in excess of .132%, the officer advised L.B. that she was subject to arrest which in turn would necessitate notification and involvement of Northern Cheyenne social services officials to attend to her children. In fear of losing her job, L.B. repeatedly pled with the officer to not arrest her. When he responded that "something had to be done," L.B. asked whether he was referring to "sex." After the officer answered in the affirmative, L.B. engaged in sexual intercourse with him to avoid being arrested. The officer thus crossed the line between authorized conduct on one hand, and tortious criminal conduct on the other, when he acknowledged that he was referring to sex and then engaged in sexual intercourse with L.B. in return for not arresting her.

¶37 Under those circumstances, I agree that it was at least a question of fact for jury determination, if not beyond genuine material dispute for purposes of Fed. R. Civ. P. 56, that the officer's unauthorized use of his official authority to coerce L.B. into engaging in sexual intercourse both *arose out of* and was *closely related to*, or *intermingled with*, the performance of an expressly or implicitly authorized act or function. However, while an outstanding jury question may or may not exist under the first prong of the pertinent legal test in this case, the analysis does not end there. In either event, the dispositive issue on the particular evidentiary record in this case is whether there is sufficient evidence on the stipulated factual record presented upon which the finder of fact could further reasonably

32

conclude that the officer used his authority to coerce L.B. to engage in sexual intercourse at least in part *as a means to accomplish* an expressly or implicitly *authorized* official task, duty, function, or purpose, *rather than* solely for his own personal purpose or benefit. This dispositive question is a purely factual matter in regard to which the "[t]he state of mind of the employee" at the time "is determinative." *Brenden*, ¶ 18 (citing Restatement (Third) of Agency § 7.07 cmt. b; Restatement (Second) of Agency § 235 cmt. a).

¶38 Based on the stipulated factual record here, there is simply no non-speculative factual basis upon which the finder of fact could reasonably conclude that the BIA officer used his authority to coerce L.B. to engage in sexual intercourse for any purpose other than *solely for his own personal sexual gratification*. As a threshold matter, contrary to the Court's apparent assertion, there is no record factual basis upon which to conclude that the abusive use of an officer's authority to coerce the subject of an investigation into engaging in sexual intercourse is either an act *typically* or *normally* performed by, or reasonably expected of, law enforcement officers in general, or BIA officers in particular. Nor does the Court squarely dispute that the officer coerced L.B. to engage in sexual intercourse, at least in part, in furtherance of his own personal sexual gratification. There is no non-speculative record factual basis upon which to reasonably conclude otherwise. In the face of those record facts beyond genuine material dispute, L.B.'s vicarious liability claim against the United States simply fails *as a matter of law* absent a non-speculative record factual basis upon which the factfinder could *reasonably conclude* that the BIA officer also, at least in part, intended his use of his official authority to coerce L.B. into engaging in sexual intercourse *as a means*, however misguided or illegal, to *further or accomplish*

33

*an authorized law enforcement task*, *duty*, *function*, *or purpose* apart from his own personal sexual gratification.

¶39 Contrary to the Court's cursory assertion, the fact that the officer responded to L.B.'s pleas by stating that "something had to be done" about her apparent criminal conduct is clearly not alone a sufficient non-speculative evidentiary basis upon which to reasonably conclude that he in any regard pressured L.B. to engage in sexual intercourse as a means to further or accomplish any authorized law enforcement task, duty, function, or purpose. Manifesting the glaring lack of requisite record proof under the employee motive/purpose prong of the course or scope of employment test, the Court wanders off into a patently irrelevant and misleading discussion of the facts that: (1) law enforcement officers often "initiat[e] nonconsensual" and "invasive[] physical contact with" criminal suspects; (2) law enforcement officers have "considerable and intimidating powers" to use reasonable force in executing lawful searches and apprehending suspected criminals in furtherance of "law enforcement goals"; (3) L.B. and Amici "argue there is systemic misconduct within the BIA and violence against Native American women on reservations"; and (4) the officer's statement that "something had to be done" "illustrates [*L.B.'s*] *belief* of the power dynamic at play . . . between a BIA officer and . . . [tribal] resident." However, *none* of those facts have *any probative value or bearing* whatsoever, much less as affirmative proof, on the dispositive question as to whether the subject officer intended his tortious coercion of L.B.

to engage in sexual intercourse at least in part as a means to accomplish any conceivable law enforcement purpose aside from his own personal sexual gratification.[5]

¶40   Tacitly recognizing this glaring lack of requisite record proof, the Court attempts to suggest a conceivable law enforcement purpose which the BIA officer may have intended his coercion of L.B. to engage in sexual intercourse to accomplish, to wit:

> Officers have significant police discretion to enforce certain laws and to let civilians off with a warning. This discretion benefits the law enforcement agency and ultimately the taxpayers by keeping certain violations out of the criminal justice system and freeing up government resources. When an officer tells a law-breaking civilian he will let her go as long as she, e.g., repairs her windshield, replaces her tail-light, promises not to repeat the same unlawful conduct, or offers to give up a criminal associate, he does so, in part, to benefit his employer. Similarly, when an officer intimidates a civilian through, e.g., the use-of-force or the threat of force, he provides a benefit to his employer by maintaining law and order in the community. The certified facts could lead a trier of fact to conclude that Officer Bullcoming's wrongful conduct was predicated upon and incident to his employment as a BIA officer.

---

[5] Beyond its manifest irrelevance, the Court's reference to the arguments of L.B. and Amici, regarding alleged "systemic misconduct within the BIA and violence against Native American women on reservations" is even further peculiar here. From a relevance standpoint, *none* of the secondary factual sources cited by L.B. or Amici draw or manifest *any* correlative link between the noted epidemic of violence committed against Native American women on reservations and any "systemic" abusive use of power *by BIA officers to assault Native American women*, whether sexually or otherwise. Even more disturbingly, the Court's notice of those asserted facts as part of its decisional rationale patently violates and disregards our rule and admonition that, when "M. R. App. P. 15(3) permits this Court to answer a question of law certified to it by another qualifying court," "our review of [the] certified question is [limited to] an interpretation of the law *as applied to* the *agreed facts* underlying the action." *Bassett v. Lamantia*, 2018 MT 119, ¶ 7, 391 Mont. 309, 417 P.3d 299 (emphasis added). Here, neither of the referenced factual assertions of L.B. and Amici noted by the Court is included in the agreed facts stated in the certified question. *Compare  L.B. v. United States*, 8 F.4th 868, 869-70 (9th Cir. 2021) (certified question). *See similarly L.B. v. United States*, No. CV-18-74-BLG-SPW (D. Mont. Aug. 28, 2019) (adopting Magistrate's proposed findings and recommendations in full and granting BIA's motion for summary judgment that FTCA bars L.B.'s respondeat superior claim); *L.B. v. United States*, No. CV 18-74-BLG-SPW-TJC (D. Mont. July 16, 2019) (Magistrate's proposed findings and recommendation for grant of BIA motion for summary judgment that FTCA bars L.B.'s respondeat superior claim).

Opinion, ¶ 18. Reducing this proffered rationale to its pertinent essence, the Court thus suggests that the finder of fact could reasonably conclude on the limited evidentiary record presented that, in addition to furthering his own personal sexual gratification, the BIA officer, at least in part, intended his coercion of L.B. to engage in sexual intercourse as a means of "benefiting the [BIA] and ultimately the taxpayers by keeping [her alleged criminal conduct] out of the criminal justice system and freeing up government resources," thereby "benefit[ting] his employer" "by maintaining law and order in the community." However, apart from the manifest ridiculousness of that assertion, the Court's reasoning has two fatal flaws: it is purely speculative without *any* inferential basis in the stipulated facts stated in the certified question, and further, falsely equates the abusive use of an officer's authority to coerce a citizen into engaging in sexual intercourse with an officer's perfectly legitimate and proper act of threatening a citizen with arrest and criminal prosecution as a means to coerce his or her compliance with the law or cooperation with a separate law enforcement investigation. Further undermining its analysis, the Court incredibly asserts that it is speculative, without record inferential basis, to suggest here that the subject BIA officer abusively coerced L.B. into engaging in sexual intercourse for his own personal sexual gratification, but then inconsistently concludes that a jury question exists because the record facts are susceptible to "two or more reasonable inferences" regarding the officer's motive or purpose. Opinion, ¶ 18. The Court's faulty reasoning aside, there is, as a threshold matter of law, simply no *non-speculative* direct or inferential factual basis on the factual record stated in the certified question upon which the finder of fact could *reasonably* conclude that the subject BIA officer, at least in part, intended his

36

coercion of L.B. to engage in sexual intercourse as a means of accomplishing any authorized law enforcement task, duty, function, or purpose, apart from furthering his own personal sexual gratification. Thus, based on the stated stipulated record facts, the only correct answer to the certified question under M. R. App. P. 15(3) is "no," in the manifest absence of any evidentiary basis upon which to reasonably conclude that the officer intended his tortious conduct at least in part as a means to accomplish an authorized law enforcement task, duty, function, or purpose apart from his own sexual gratification, a law enforcement officer does *not* act within the course and scope of his or her employment for purposes of Montana common law vicarious employer liability when he or she abuses his or her official authority to coerce the subject of an investigation to engage in sexual activity.

C. Conclusion.

¶41 Upon close comparison of the essence of the Majority and dissenting analyses here, the Ninth Circuit will surely recognize that, regardless of the Majority's failure to state the pertinent Montana respondeat superior law in a more concise and logically progressive manner, the difference in our disparate answers to the certified question does not lie in any significant disagreement regarding the essential *legal requirements of proof* under Montana law, as applicable in this case. At bottom, both essentially recognize in pertinent part that the substantive Montana respondeat superior test for whether unauthorized employee conduct was nonetheless committed in the course or scope of the subject employment requires proof of two distinct legal elements: (1) that the unauthorized employee conduct at issue both *arose out of* and was *closely related to*, or *intermingled with*, the performance of an expressly or implicitly authorized act or function; *and* (2) the employee intended the

37

subject unauthorized conduct, at least in part, *as a means to accomplish* an expressly or implicitly *authorized* act, task, function, or purpose, *rather than solely for his or her own personal purpose or benefit*. The essential difference is thus the disparate manner in which the Majority and dissenting opinions apply the dispositive Montana proof requirement regarding the BIA officer's motive or intent to the stipulated facts stated in the certified question under the governing evidentiary standard of Fed. R. Civ. P. 56, a matter ultimately in the exclusive power and domain of the Ninth Circuit upon further appellate review.

¶42 In that regard, I certainly understand and share this Court's outrage with the abusive criminal conduct of the rogue law enforcement officer at issue here. I thus agree that, in the ordinary course in accordance with Fed. R. Civ. P.56, L.B. "should have the opportunity to present evidence" to a jury "in support of her contention" that the subject BIA officer was acting within the scope of his employment when he used his official authority to pressure her for sex. But, like all other tort claimants, she should have that opportunity *only after* clearing the hurdle of making a non-speculative Rule 56 evidentiary showing on *both* of the *elements of proof* required under Montana law to establish that an employee engaged in the unauthorized tortious conduct at issue while acting within the course or scope of his or her employment. Unfortunately for her, the stipulated evidentiary facts stated in the certified question are insufficient as a matter of law to satisfy that burden under the substantive requirements of the governing Montana law. I dissent.

/S/ DIRK M. SANDEFUR

Justice Jim Rice joins in the dissenting Opinion of Justice Sandefur.

/S/ JIM RICE